Jeffrey M. Forster, SBN 50519
Law Offices of Jeffrey M. Forster
160 West Santa Clara Street
Suite 1100
San Jose, CA 95113
Phone: (408) 977-3137
Fax: (408) 977-3141
Email: jforstr@pacbell.net

Attorney for Plaintiff Anthony Sarkis

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

ANTHONY SARKIS

           Plaintiff,

   v.

MIROSLAV LAJCAK, IN HIS OFFICIAL
CAPACITY AS HIGH REPRESENTATIVE;
OFFICE OF THE HIGH REPRESENTATIVE

           Defendants.

Case No. C08 01911 PVT

**COMPLAINT WITH
DEMAND FOR JURY
TRIAL**

Complaint

## COMPLAINT

COMES NOW plaintiff Anthony Sarkis (hereinafter "Plaintiff"), by and through the undersigned counsel, and, pursuant to F.R. Civ. Proc. 7, for a demand states and avers as follows:

### JURISDICTION

1a.   Jurisdiction is founded on 28 USC §§ 1332(a)(2). The matter in controversy exceeds the value or sum of $75,000, exclusive of interest and costs.  Plaintiff is a citizen of the United States and a resident of the State of California.  Defendants are aliens. Other facts supporting jurisdiction in this matter are set forth in the Parties section and the General Allegations, below.


### VENUE AND INTRADISTRICT ASSIGNMENT

1b.   Venue is proper pursuant to 28 USC § 1391(d).  Defendants are aliens. Venue is not based on events or omissions occurring in a particular district.  Case assignment to this division is, therefore, appropriate.

### NATURE OF THE CASE

2.   Defendant Office of the High Representative (hereinafter "OHR") agreed to engage Plaintiff as its general counsel and retain him in that office, absent cause, for the duration of OHR's mandate (hereinafter "Umbrella Agreement").  In pegging the term of Plaintiff's employment to the mandate of OHR, the Umbrella Agreement, expressly, impliedly and/or by operation of law, imposed the requirement of "cause" for its termination (hereinafter "Mandate-Pegged, For-Cause Employment").

3.    The Umbrella Agreement further provided for and stipulated that it would subsume and be marked by a series of consecutive annual subsidiary contracts. Said contracts implemented the annual elements of the Mandate-Pegged, For-Cause Employment provided for in the Umbrella Agreement. The effluxion of each subsidiary contract would, absent cause, trigger OHR's declared and assumed legal obligation to renew and extend the same for each succeeding calendar year in the remaining balance of the Mandate-Pegged, For-Cause Employment. The subsidiary contracts expressly and by custom/practice and operation of law also required cause for their termination (hereinafter "Subsidiary For-Cause Contracts").

4.    The necessity of executing the Subsidiary, For-Cause Contracts and of subsuming the same under the Umbrella Agreement was dictated by fiscal constraints operating on OHR.

5.    In 2007, OHR breached both the Umbrella Agreement and the last of the Subsidiary For-Cause Contracts. It dismissed Plaintiff prior to the end of OHR's mandate and the end-date of the 2007 Subsidiary For-Cause Contract without warning, a stated cause and a disciplinary hearing, all of which were required by, among other things, explicit provisions in the 2007 Subsidiary For-Cause Contract (hereinafter "Termination").

6.    OHR took the further step of expelling Plaintiff, without justification, from the organization's premises on the day of the Termination, despite said termination taking effect two months later (hereinafter "Same-Day Expulsion").

7.    The Termination and the Same-Day Expulsion lacked justification or legal basis. They were retaliatory and discriminatory and breached governing contracts,

Complaint

violated public policy, defamed Plaintiff, inflicted upon him severe emotional distress and exposed fraudulent conduct on the part of OHR.

## THE PARTIES

8.   Plaintiff is a citizen of the United States and an adult resident of the State of California.  He is under no legal disability.

9.   Defendant OHR is an entity purportedly possessing a distinct juridical personality under the laws of Bosnia and Herzegovina.  OHR is headquartered in Sarajevo, Bosnia and Herzegovina (hereinafter "BiH").

10.   Defendant Miroslav Lajcak (hereinafter "Dr. Lajcak") serves currently as High Representative for Bosnia and Herzegovina (hereinafter "HR") and as legal successor-in-interest to former HRs Baron Ashdown of Norton-sub-Hamdon (hereinafter "Lord Ashdown") and Dr. Christian Schwarz-Schilling (hereinafter "Dr. Schwarz-Schilling").  The acts complained of herein occurred during the mandates of Lord Ashdown and Dr. Schwarz-Schilling.  Dr. Lajcak is a citizen of the Slovak Republic.

11.   OHR constitutes the "staff" of the incumbent HR -- in the instant case, Dr. Lajcak -- as that term is defined in Article III of Annex 10 to the founding instrument of the office of the HR, the General Framework Agreement for Peace in Bosnia and Herzegovina (hereinafter "GFAP").  All of the acts and omissions described herein with respect to OHR are duly attributable to Dr. Lajcak, officially, as legal successor-in-interest to Lord Ashdown and Dr. Schwarz-Schilling, as the current HR and as OHR's principal, for whom OHR acts as agent/agency, instrumentality, alter ego and/or otherwise acts under his direction, control and/or delegation of authority.

Complaint

## GENERAL ALLEGATIONS

### OHR's California Representations and Jurisdictional Facts

12. In January, 2003, Plaintiff, residing in California at the time, noted in The Economist, a weekly news magazine enjoying wide circulation in California, OHR's advertisement for the vacant position of "Legal Counsel". The advertisement referred interested parties to OHR's website, which also reaches California, for further details concerning the vacancy. While still residing in California, Plaintiff accessed said website. Neither it nor the The Economist advertisement gave any indication that the position was anticipated to be short term or not pegged to the OHR mandate (hereinafter "Advertisements"). The Advertisements instead represented the position as extending beyond 2003, implying its multi-year nature by, *e.g.*, describing the compensation package in "per annum" terms.

13. The Advertisements' representation of multi-year employment was consistent with Plaintiff's understanding of the function of in-house legal counsel which is integral to the ongoing operations of an organization.

14. Plaintiff applied for the position while still in California. His cover letter and *curriculum vitae* clearly displayed his California contact information.

15. In February 2003, OHR invited Plaintiff via email to a telephone interview. On February 25, 2003, OHR initiated the telephone interview with Plaintiff – at the time in California -- using a California telephone number provided to it by Plaintiff via an email originating in California. During said interview, one OHR panel member, then-Deputy High Representative, Head of the Legal Department and the immediate

Complaint

supervisor of the OHR Legal Counsel, Ian Campbell (hereinafter "Campbell"), stated the following to Plaintiff:

> OHR is programmed to self-destruct at some point. It could be here for ten years or it could close tomorrow. So your job could be as long or as short. How do you feel about working under these conditions?

(hereinafter "Campbell Interview Representation").

16.   Campbell had actual, ostensible and/or apparent authority to speak on behalf of OHR.

17.   The Campbell Interview Representation confirmed Plaintiff's belief that the vacant position could be long term and would be pegged to OHR's mandate.

18.   The OHR interview panel consisted also of Gisbert Bruns, another Deputy High Representative and Director of the OHR Resources Department (hereinafter "Bruns"). Bruns did not contradict, correct, amend or otherwise qualify the Campbell Interview Representation (hereinafter "Bruns Interview Silence"). He confirmed the anticipated mandate-pegged nature of the position by stating that the successful candidate for the Legal Counsel position should not expect automatic annual raises in the years following 2003, as OHR had in place a policy not to award these to international staff members, irrespective of the length of their service (hereinafter "Bruns Interview Representation").

19.   Bruns had actual, ostensible and/or apparent authority to speak on behalf of OHR.

20.   Following the interview, Plaintiff provided to OHR the name, address and telephone number of a Los Angeles-based reference. Upon information and belief,

Complaint

Plaintiff avers that OHR initiated a lengthy telephone call to said reference, using his Los Angeles telephone number.

21.   On or about March 4, 2003, OHR tendered to Plaintiff OHR's offer of employment ("OHR Offer"). The OHR Offer was emailed by OHR to Plaintiff by OHR's principal Personnel Officer, one of the three OHR officials interviewing Plaintiff and the OHR official, at the time, authorized by OHR to be in contact with Plaintiff concerning the vacant position, Sunita Samarah (hereinafter "Samarah"). Plaintiff opened the email and the attached OHR Offer in California. The OHR Offer stated that his employment period would commence in April 2003 and end on December 31, 2003.

22.   The December 31, 2003 end-date in the OHR Offer greatly disturbed Plaintiff. He had no intention of uprooting from California and the United States and relocating to BiH for only a nine-month stint.

23.   Plaintiff immediately emailed Samarah requesting a telephone conference to clarify the issue. Samarah replied by email that she would call the following day. When the two spoke on March 5, 2003, while Plaintiff was in California, Plaintiff expressed his profound concern about the short-term nature of the employment, as stated in the OHR Offer. Samarah assured and represented to him that the position was intended to extend beyond 2003, that Subsidiary, For-Cause Contracts "are routinely renewed", that the relationship "would break only if there was a major reason" and that OHR would need Plaintiff's legal advice "into the future, especially to dissolve OHR" (hereinafter "Samarah 2003 Representation"). The Samarah 2003 Representation constituted confirmation of the Employment-Pegged, For-Cause Employment and of the Subsidiary For-Cause Contracts subsumed therein.

Complaint

24.    Samarah had actual, apparent and/or ostensible authority to speak on behalf of OHR.

25.    Plaintiff advised Samarah that, based on their conversation, he would sign the OHR Offer.

26.    Through his March 5, 2003 signature, appended in California, Plaintiff accepted the OHR Offer.  The accepted OHR Offer contained no language designating the employment as "at will" or its termination as effective "without cause".

27.    Plaintiff faxed the accepted OHR Offer to OHR from California.  The California fax origination data would have appeared prominently on the accepted offer letter received by OHR.

28.    Following the acceptance of the OHR Offer, Plaintiff coordinated his travel plans with OHR which was purchasing his flight ticket.  In this connection, Plaintiff, on numerous occasions:  (A) provided to the relevant OHR staff member his California contact information, including his telephone number, which she used to contact him; and (B) indicated that the times referenced in his correspondence were "California time".

29.    On March 11, 2003, in response to an emailed concern raised by Plaintiff, while still in California, concerning the disposition of accrued leave at the end of the calendar year, Samarah dispatched the following email to Plaintiff while still in California:

> Thank you for your e-mail.  Regarding your concern about the vacation, as per our current Policy, staff member is entitled to carry over up to 10 unused leave days into the new contractual period. All other days which are not used during the current contractual period will be forfeited

(hereinafter "Samarah 2003 Unused Leave Representation").

Complaint

30.   The Samarah 2003 Unused Leave Representation provided further confirmation:  (A) that OHR intended the Legal Counsel position to be mandate-pegged; and (B) that OHR had a sufficiently high number of long-term employees to warrant having a formal policy concerning, *inter alia*, the disposition of accrued leave at the end of each calendar year.

31.   On March 24, 2003, Samarah dispatched via email to Plaintiff in California a copy of his proposed 2003 Subsidiary For-Cause Contract (hereinafter "Proposed 2003 Contract").   The Proposed 2003 Contract contained no provision referring to "at will" employment or "without cause" termination.

32.   Upon reviewing the Proposed 2003 Contract, Plaintiff noted it did not include a provision concerning the timeframe for a non-renewal notice.  In a March 27, 2003 email, dispatched from California, Plaintiff raised this issue with Samarah and added:

> I have every confidence that both parties are negotiating this contract in good faith with the intent to renew our promising association **so long as OHR's mandate and the parties' satisfaction with the relationship continue...** . As this issue is of profound significance, I would be grateful to receive your response prior to my arrival in Sarajevo, preferably by Friday, 28 March 2003.

(Emphasis added.)

33.   The reply email came from Ian Doig, then-Head of OHR's Personnel Department ("Doig").  Plaintiff opened said email in California.  It stated the December 31, 2003 end- date on the Proposed 2003 Contract was a requirement imposed by OHR's supervisory body.  Doig added, however, that the Subsidiary For-Cause Contracts are renewed, except "for cause", at the end of each given calendar year.  He concluded the email by assuring Plaintiff:

Complaint

You are absolutely correct in your assumption about good faith. Our intention is that we will still be colleagues in 2004.

Doig's email confirmed the Employment-Pegged, For-Cause Employment subsuming the Subsidiary For-Cause Contracts (hereinafter collectively "Doig 2003 Representation").

34.    Doig had actual, apparent and/or ostensible authority to speak on behalf of OHR.

35.    On March 28, 2003, Plaintiff emailed Doig again, confirming that, based on the Doig 2003 Representation, Plaintiff was prepared to relocate to BiH and join OHR:

...your reassuring words have persuaded me that additional contractual language is unnecessary, provided we both recognize that this issue is of some import to me. **I wouldn't be planning a career with the OHR if I lacked confidence in its good faith.** I look forward to meeting you and all my other colleagues in April.

(Emphasis added.) Doig did not contradict, correct or attempt to disabuse Plaintiff of his expressed belief. A true copy of the above March 27-28, 2003 email exchange between Doig and Plaintiff (hereinafter "Doig-Plaintiff 2003 Email Exchange") is appended hereto as PX A and is adopted and incorporated herein by reference as if specifically set forth herein.

36.    The full Doig-Plaintiff 2003 Email Exchange was "carbon-copied" or "blind carbon-copied" to Bruns. Bruns never communicated to Plaintiff, nor caused to be communicated, any contradiction or correction of or amendment, caveat or qualification to the Doig 2003 Representation (hereinafter "Bruns Email Silence").

37.    The Doig 2003 Representation did not state that termination of the Subsidiary For-Cause Contracts was treated differently from non-renewals with respect to the "good cause" requirement.

Complaint

38.   The Advertisements, the Campbell Interview Representation, the Bruns Interview Silence, the Bruns Interview Representation, the OHR Offer, the Proposed 2003 Contract, the Samarah 2003 Representation, the Samarah Unused Leave Representation, the Doig 2003 Representation and the Bruns Email Silence shall hereinafter be referred to collectively as the "OHR's California Representations".

### The Subsidiary For-Cause Contracts

39.   In April, 2003, Plaintiff and OHR entered into the first of the Subsidiary For Cause Contracts whose principal terms mirrored those in the OHR Offer (hereinafter "2003 Subsidiary For-Cause Contract"). When OHR delivered to Plaintiff the 2003 Subsidiary For-Cause Contract for signature on or about April 7, 2003, it was accompanied by, *inter alia*, the OHR 2002 Personnel Policies and Procedures (hereinafter "2002 PPP"). These were delivered to Plaintiff in the Personnel Offices of OHR. Pursuant to Item 1 of the 2003 Subsidiary For-Cause Contract, the 2002 PPP were incorporated therein by reference and constituted an integral part of the contract.

40.   Plaintiff read the 2002 PPP before signing. He noted therein Item 36, entitled "Disciplinary Procedures", regarding adequate cause for dismissal, recorded and communicated to the staff member through advance warnings concerning alleged misconduct or performance shortcomings. The 2002 PPP also contained provisions setting forth OHR's expectation and/or implying that its staff enjoyed long-term employment, including Items 18(a), 24(e), 28(c) and 30(a). Item 36 and the long-term employment provisions of the 2002 PPP shall hereinafter be referred to collectively as "OHR's 2002 PPP Representations".

Complaint

41.   The 2003 Subsidiary For-Cause Contract's end-date was December 31, 2003.  Thereafter, the Umbrella Agreement's guarantee of Mandate-Pegged, For-Cause Employment was implemented, with some substantive changes, through four (4) other Subsidiary For-Cause Contracts for the years 2004, 2005, 2006 and 2007.  None of these Subsidiary For-Cause Contracts contained an integration clause.  They were all substantially predicated upon and entered into by Plaintiff on the basis of the Umbrella Agreement and/or OHR's California Representations.

42.   In addition, the 2003 Subsidiary For-Cause Contract was entered into in reliance further upon OHR's 2002 PPP Representations, as alleged above.

43.   In or about November 2006, OHR delivered to Plaintiff the last of his Subsidiary For-Cause Contracts for the year 2007 (hereinafter "2007 Subsidiary For-Cause Contract").  The 2007 Subsidiary For-Cause Contract encompassed the period between January 1, 2007 and October 31, 2007.

44.   The 2007 Subsidiary For-Cause Contract was virtually identical to the Proposed 2003 Contract, as finalized in the 2003 Subsidiary For-Cause Contract.  The 2007 Subsidiary For-Cause Contract was also identical to its four predecessors, the Proposed 2003 Contract and the OHR Offer in that it contained no language referencing "at will" employment or "without cause" termination.

45.   Additionally, the 2007 Subsidiary For-Cause Contract, as with its four predecessors, incorporated by reference the PPP.  Both the "Adequate Cause" requirement and the disciplinary modalities in the 2007 Subsidiary For-Cause Contract and its predecessors were made more muscular in June 2003 when the PPP were

amended (hereinafter "2003 PPP") and a separate body of internal law, the "OHR Disciplinary Procedures", was promulgated by OHR.

46. In the 2003 PPP, Item 39 added nearly a page to the 2002 PPP provisions governing disciplinary procedures and dismissal of a staff member. Specifically, Item 39(b) of the 2003 PPP requires warnings prior to and "adequate cause" for dismissal, the validity of said cause to be adjudged by the OHR Disciplinary Committee. Item 39(d) of the 2003 PPP incorporates by reference the OHR Disciplinary Procedures (hereinafter "DP"). Since the DP are incorporated into the PPP and the PPP are, in turn, incorporated into the Subsidiary For-Cause Contracts, the DP also constitute an integral part of Plaintiff's post-2003 Subsidiary For-Cause Contracts, including the 2007 Subsidiary For-Cause Contract. The DP constitute six pages of precise modalities setting forth, *inter alia*, the "adequate cause" requirement for dismissal, its definition and the vehicle for its adjudication, to wit, the Disciplinary Committee. Both the PPP and The DP were published and made available to Plaintiff and other OHR staff members on the OHR intranet site throughout the relevant period.

47. The 2007 Subsidiary For-Cause Contract, like its four predecessors, also contained numerous provisions implying continuous employment. These included Items 13, 18(b) and(c), 24(e) and (f), 28(b) and 32(d) of the 2003 PPP.

48. The pre-dismissal disciplinary provisions of the 2003 PPP and the DP (incorporated by reference in the 2003 PPP), and the 2003 PPP provisions implying long-term, continuous employment shall hereinafter be referred to as "OHR's 2003 PPP Representations".

## OHR's Further Representations

49.  In or about October 2003, Edouard d'Aoust (hereinafter "d'Aoust"),
successor to Campbell as Head of the Legal Department and Plaintiff's immediate
supervisor, stated to Plaintiff:

> You have nothing to worry about.  Your job will last till the end of OHR.  You'll
> be one of the ones turning out the lights.

(hereinafter "d'Aoust Representation").  The d'Aoust Representation was made in OHR
during a conversation d'Aoust, Plaintiff and others were engaged in over the
consequences to staff of OHR's eventual dissolution.  D'Aoust repeated the gist of the
d'Aoust Representation to Plaintiff on other occasions in 2005 and 2006 when the issue
of OHR's dissolution arose again.  D'Aoust had the actual, apparent and/or ostensible
authority to speak on behalf of OHR.

50.  In or about September 2004, OHR adopted and communicated to Plaintiff
the OHR retention bonus policy.  The declared objective of this policy was to reward and
induce staff's commitment to continued employment at OHR through its liquidation.  To
prevent a mass exodus of staff ahead of its eventual dissolution, OHR officially offered to
staff members above a certain grade, including Plaintiff, a sizable retention bonus -- four
months' base salary – said right to become vested if they remained with OHR until its
dissolution, whenever that might be, or until such time as their positions were downsized,
whichever event occurred first (hereinafter "Retention Bonus Policy").   The Retention
Bonus Policy was communicated to staff, including Plaintiff, both verbally and in writing
and made available via the OHR intranet site (hereinafter "Retention Bonus Policy
Representation").

51.  In or about September 2006, OHR verbally and in writing offered Plaintiff to join a small team tasked with winding down OHR during its dissolution phase (hereinafter "Liquidation Team Offer").  Plaintiff accepted the Liquidation Team Offer.

52.  The d'Aoust Representation, the Retention Bonus Policy Representation and the Liquidation Team Offer further were made in furtherance of and in accordance with the Umbrella Agreement and confirmed its guarantee to Plaintiff of Mandate-Pegged, For-Cause Employment.

### Termination and Same-Day Expulsion

53.  On April 13, 2007, without prior notice or warning of any kind, without adequate or good cause, without a stated explanation or justification, without compliance with the 2003 PPP and, in particular, without compliance with the DP, and in violation of the Umbrella Agreement, the Subsidiary For-Cause Contracts and the representations, promises, covenants and commitments made to Plaintiff -- among them, OHR's California Representations and the 2002 PPP -- and at variance with past practice, custom and conduct, OHR suddenly and peremptorily terminated Plaintiff's employment, effective June 12, 2007.  Also on April 13, 2007, OHR expelled and banned Plaintiff from its premises as of that date.  Plaintiff is informed and believes, and upon such information and belief alleges, Bruns and d'Aoust recommended the Termination and Same-Day Expulsion to Dr. Schwarz-Schilling and concurred in his decision to terminate and expel Plaintiff.  The Termination and Same-Day Expulsion were discriminatory and in retaliation for frank advice rendered by Plaintiff.

Complaint

**Plaintiff's Performance at OHR**

54.   Throughout his term at OHR, Plaintiff discharged his duties faithfully and in exemplary fashion.  This is evidenced by reference letters concerning Plaintiff written by the two successive HRs he served, Lord Ashdown and Dr. Schwarz-Schilling.  True copies of said reference letters are appended hereto as PXs B and C, respectively, and are adopted and incorporated herein by reference as if specifically set forth herein.

55.   On or about June 1, 2005, OHR officially elevated Plaintiff from Legal Counsel to General Counsel.

56.   On or about mid-2005, OHR awarded Plaintiff an 11% percent raise in pay. Plaintiff was among only two or three international staff members (hundreds in all) who have received pay raises based strictly on the superior level of performance.

57.   OHR entrusted Plaintiff with additional substantial responsibility by, for example:  (A) appointing him concurrently as *ex officio* general counsel of OHR's sister organization, the Office of the European Union Special Representative in BiH (hereinafter "OEUSR"); and (B) directing him to meet in late 2003 with Dr. Schwarz-Schilling, the future HR who would terminate Plaintiff in 2007, to request, on behalf of OHR, that he cease and desist from his private mediation activities in BiH.

58.   Commencing in late 2003 and extending to 2007, OHR tasked Plaintiff to initiate and spearhead direct negotiations with several foreign governments on highly sensitive issues.

59.  OHR asked Plaintiff to serve as one of only two senior international staff members in the residual 22-person OHR Liquidation Team.

Complaint

60.  Throughout Plaintiff's employment at OHR, Plaintiff received no negative or critical annual performance evaluations.

## COUNT ONE
### (Breach of Express Written Contract)
### (Against Both Defendants)

61.  Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 60 of the Complaint.

62.  OHR offered and Plaintiff accepted the 2007 Subsidiary For-Cause Contract.

63.  There existed among the parties a mutuality of intent as to the terms of the 2007 Subsidiary For-Cause Contract.

64.  The 2007 Subsidiary For Cause Contract, contained express provisions in the incorporated-by-reference 2003 PPP and DP requiring:

(A) warnings to Plaintiff delivered and recorded prior to contract termination (Item 39(b) of the 2003 PPP; Items B(1) and (2) of the DP);

(B) a stated "adequate cause" for contract termination (Item 39(b) of the 2003 PPP; Item F of the DP); and

(C) ultimate adjudication of the validity of the stated "adequate cause" by the duly-constituted OHR Disciplinary Committee (Items 39(b) and (c) of the 2003 PPP; Items B(3) and C(3) of the DP)

(hereinafter collectively "Dismissal Provisions").  True copies of the 2007 Subsidiary For-Cause Contract and the incorporated 2003 PPP and DP are appended hereto as PXs D, E and F, respectively, and are adopted and incorporated herein by reference as if specifically set forth herein.

65.   The 2007 Subsidiary For-Cause Contract further contained an express provision -- Item 5 -- requiring a two-month notice period preceding its effective termination date (hereinafter "Notice Provision").

66.   OHR breached the 2007 Subsidiary For-Cause Contract with Plaintiff by, *inter alia*:

(A) terminating said contract without a stated, legally-cognizable cause in violation of Section 2924 of the California Labor Code;

(B) dismissing him in a manner violative of the contract's Dismissal Provisions; and

(C) directing the Same-Day Expulsion , in violation of Item 5.

67.   OHR's breaches of the 2007 Subsidiary For-Cause Contract were material.

68.   Plaintiff provided consideration for the 2007 Subsidiary For-Cause Contract.

69.   Plaintiff performed in full pursuant to the terms of said contract.

70.   As a direct, proximate and foreseeable consequence of OHR's breaches, Plaintiff sustained loss, injury and damages, including lost income and benefits.

**COUNT TWO**
**(Breach of Express Written Contract)**
**(Against Both Defendants)**

71.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 70 of the Complaint.

72.   OHR offered and Plaintiff accepted a Subsidiary For-Cause Contract for the calendar year 2006 (hereinafter "2006 Subsidiary For-Cause Contract").

73.   There existed among the parties a mutuality of intent as to the terms of the 2006 Subsidiary For-Cause Contract.

Complaint

74. The 2006 Subsidiary For-Cause Contract required an annual performance evaluation of Plaintiff no later than December 1, 2006, with verbal and written feedback to Plaintiff outlining shortcomings in performance, if any, and action that might be taken in the absence of remedial steps, if any (hereinafter "2006 Performance Evaluation"). Said requirement appears in Item 35 of the 2003 PPP which were incorporated by reference into the 2006 Subsidiary For-Cause Contract by Item 1 thereof.

75. The terms, contents and incorporated documents of the 2006 Subsidiary For-Cause Contract were in all material respects identical to those of the 2007 Subsidiary For-Cause Contract, already appended hereto as PXs D through F.

76. OHR breached the 2006 Subsidiary For-Cause Contract by failing to provide the 2006 Performance Evaluation.

77. OHR's breach was material. .

78. Plaintiff provided consideration for the 2006 Subsidiary For-Cause Contract.

79. Plaintiff performed in full pursuant to the terms of said contract.

80. As a direct, proximate and foreseeable consequence of OHR's breaches, Plaintiff sustained loss, injury and damages, including lost income and benefits.

## COUNT THREE
### (Breach of Express Written Contract)
### (Against Both Defendants)

81. Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 80 of the Complaint.

82. The Doig-Plaintiff 2003 Email Exchange contained an offer by Doig on behalf of OHR to Plaintiff of the Mandate-Pegged, For-Cause Employment which subsumed, comprised and was marked by, for annual implementation purposes, the

Complaint

Subsidiary For-Cause Contracts. Doig independently and in conjunction/consonance with OHR's earlier statements, representations, covenants and promises, extended this offer on behalf of OHR.

83.   Plaintiff accepted said offer during the Doig-Plaintiff 2003 Email Exchange.

84.   There existed among the parties mutuality of intent.

85.   The result was the Umbrella Agreement.

86.   The Umbrella Agreement, as evidenced by the Doig-Plaintiff 2003 Email Exchange, shall hereinafter be referred to as the "Doig-Plaintiff Contract".

87.   OHR breached the Doig-Plaintiff Contract.

88.   OHR's breach of the Doig-Plaintiff Contract was material.

89.   Plaintiff provided consideration for the Doig-Plaintiff Contract.

90.   Plaintiff performed in full pursuant to the terms of said contract.

91.   As a direct, proximate and foreseeable consequence of OHR's breaches, Plaintiff sustained loss, injury and damages, including lost income and benefits.

### COUNT FOUR
### (Breach of Express Oral Contract)
### (Against Both Defendants)

92.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 91 of the Complaint and pleads this Count in the alternative to Count Three.

93.   On or about March 5, 2003, Samarah, on behalf of OHR, offered, via the telephone, to Plaintiff the Mandate-Pegged, For-Cause Employment which subsumed comprised and was marked by, for annual implementation purposes, Subsidiary For-Cause Contracts (hereinafter Samarah-Plaintiff 2003 Conversation").

Complaint

94.  Plaintiff accepted said offer during the Samarah-Plaintiff 2003 Conversation and subsequently signed the written OHR Offer.

95.  As of March 5, 2003, there existed among the parties mutuality of intent, as described herein.

96.  The result was the Umbrella Agreement and the accepted OHR Offer.

97.  The Umbrella Agreement evidenced by the Samarah-Plaintiff 2003 conversation shall hereinafter be referred to as the "Samarah-Plaintiff Contract".

98.  OHR breached the Samarah-Plaintiff Contract.

99.  OHR's breach of the Samarah-Plaintiff Contract was material.

100.  Plaintiff provided consideration for the Samarah-Plaintiff Contract.

101.  Plaintiff performed in full pursuant to the terms of said contract.

102.  As a direct, proximate and foreseeable consequence of OHR's breaches, Plaintiff sustained loss, injury and damages, including lost income and benefits.


## COUNT FIVE
### (Breach of Implied-in-Fact Contract)
### (Against Both Defendants)

103.  Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 102 of the Complaint and pleads this Count in the alternative to Counts One through Four.

104.  The Umbrella Agreement constituted an implied-in-fact contract whose terms included the following:  (A) that Plaintiff would enjoy the Mandate-Pegged, For-Cause Employment at OHR; (B) that the purported "cause" for terminating said employment would be established exclusively pursuant to codified disciplinary steps,

Complaint

including prior warnings and a disciplinary hearing; (C) that OHR would disclose its assessment of Plaintiff's performance at annual evaluations; and (D) that Plaintiff would be allowed to serve out actively his two-month notice period prior to the effective date of a legally-executed termination (hereinafter "Implied Contract").

105.   The Implied Contract arose over the length of Plaintiff's tenure at OHR and from an offer by OHR, acceptance by Plaintiff and mutuality of intent, all of which may be deduced and inferred from and evidenced by, *inter alia*, the following:  (A) OHR's California Representations; (B) the d'Aoust Representation; (C) the Retention Bonus Policy Representation; (D) the Liquidation Team Offer; (E) OHR's 2002 PPP Representations; (F) OHR's 2003 PPP Representations; (G) the 2002 and 2003 PPP provisions regarding annual performance evaluations; (H) Plaintiff's longevity of service; (I) Plaintiff's promotion within OHR; (J) Plaintiff's concurrent "secondment" to the OEUSR; (K) Plaintiff's virtually-unprecedented raise; (L) Plaintiff's increased substantive responsibilities; (M) OHR's virtually-automatic renewal of the 2003 Subsidiary For-Cause Contract through four consecutive extensions; and (N) past OHR practice, custom and conduct (hereinafter collectively "Implied Contract Facts").

106.   In addition, industry standards provide further evidence of the Implied Contract.

107.   OHR breached the Implied Contract in 2007.

108.   OHR's breaches were material.

109.   Plaintiff provided consideration for the Implied Contract in the form of justifiable detrimental reliance.

110.   Plaintiff performed in full pursuant to the terms of the Implied Contract.

Complaint

111.   As a direct, proximate and foreseeable consequence of OHR's breach, Plaintiff sustained loss, injury and damages, including lost income and benefits.

### COUNT SIX
### (Promissory Estoppel)
### (Against Both Defendants)

112.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 111 of the Complaint.

113.   In February-March 2003, OHR, through its senior staff, officials, representatives and authorized legal agents, made a clear promise to Plaintiff that he would enjoy the, Mandate-Pegged, For Cause Employment (Hereinafter "California Promise"). The California Promise arose from and is reflected in OHR's California Representations, cumulatively or, in the cases of the Samarah 2003 Representation and the Doig 2003 Representation, singularly.

114.   In April 2003, OHR, through its delivery of the 2002 PPP to Plaintiff and publication of the same, made a further clear promise to Plaintiff that "cause" for terminating his Mandate-Pegged, For-Cause Employment would be stated and established only upon exhaustion of a series of disciplinary steps set forth in the 2002 PPP (hereinafter "2002 PPP Promise").

115.   By means of Item 35 of the 2003 PPP, which were delivered to Plaintiff in June 2003 and, according to OHR, applied to Plaintiff in 2006, OHR made a clear promise to him that it would provide the 2006 Performance Evaluation (hereinafter "Evaluation Promise").

116.   By means of Item 39 of the 2003 PPP and the DP, both of which were delivered to Plaintiff in June 2003 and, according to OHR, applied to Plaintiff in 2007,

Complaint

OHR made a clear promise to Plaintiff to adhere to, implement and honor the "adequate cause" requirement and the associated disciplinary procedures, as alleged herein, prior to effecting his termination (hereinafter "2007 Promise").

117.    The d'Aoust Representation, the Retention Bonus Policy Representation and the Liquidation Team Offer, jointly and severally, constituted a clear promise by OHR that Plaintiff would enjoy Mandate-Pegged, For-Cause Employment (hereinafter "Post-Arrival Promises").

118.    OHR did not honor the California Promise, the 2002 PPP Promise, the Evaluation Promise, the 2007 Promise or the Post-Arrival Promises.

119.    Plaintiff relied on said promises.

120.    Said reliance redounded to Plaintiff's substantial detriment.

121.    As a direct, proximate and foreseeable consequence of relying on the above promises not honored and repudiated by OHR, Plaintiff sustained loss, injury and damages, including unlawful termination and expulsion, lost income and benefits, said loss, injury and damages to be measured by the extent of the obligation assumed by OHR but not performed.

**COUNT SEVEN**
**(Equitable Estoppel)**
**(Against Both Defendants)**

122.    Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 121 of the Complaint.

123.    In the alternative to the mutuality of intent allegations in Counts One through Five, OHR, through its senior staff, officials, representatives and authorized legal agents, particularly Bruns, was apprised and aware of: (A) the true facts governing its

Complaint

employment relationship with Plaintiff, including OHR's actual intent regarding the length and nature of Plaintiff's work, as alleged herein; and (B) its internal assessment of Plaintiff's conduct.

124.    OHR disclosed to Plaintiff neither its true intent with respect to the terms of his employment nor its actual assessment of his professional conduct (hereinafter "Undisclosed Facts"). Instead, OHR issued OHR's California Representations and engaged in the conduct evidenced by the Implied Contract Facts (hereinafter "Affirmative Conduct").

125.    The Undisclosed Facts and Affirmative Conduct were material.

126.    OHR intended by the Undisclosed Facts that Plaintiff should rely on the resultant absence of material information and act in a manner favorable to OHR and detrimental to himself. Alternatively or cumulatively, OHR acted through its Affirmative Conduct in such a manner as to cause Plaintiff reasonably to believe that his reliance was intended.

127.    Plaintiff was actually and permissibly ignorant of the Undisclosed Facts.

128.    Plaintiff relied on OHR's silence and Affirmative Conduct, as alleged above. Such reliance was reasonable under the facts and circumstances.

129.    Plaintiff suffered injury through said reliance.

130.    As a direct, proximate and foreseeable consequence of Plaintiff's ignorance of the Undisclosed Facts and his reliance on the resultant silence and the Affirmative Conduct, Plaintiff sustained loss, injury and damages, including unlawful termination and expulsion, lost income and benefits.

Complaint

## COUNT EIGHT
### (Wrongful Termination in Violation of Public Policy -- California Labor Code Section 970)
### (Against Both Defendants)

131.  Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 130 of the Complaint.

132.  OHR's termination without cause of Plaintiff's Mandate-Pegged, For-Cause Employment and the 2007 Subsidiary For-Cause Contract was unlawful, in bad faith, and without justification, and in violation of the public policy embodied in Section 970 of the California Labor Code.

133.  OHR made OHR's California Representations. It did so through certain of its senior staff members, officers, representatives and authorized agents, in particular Bruns, as alleged herein. These officials, in particular Bruns, made, directed to be made, authorized to be made, ratified, sanctioned and/or adopted through silence one or more of OHR's California Representations, as alleged herein (hereinafter "Channels of OHR's California Representations").

134.  OHR's California Representations took place while Plaintiff was in California. They were made in order for OHR successfully to solicit and influence Plaintiff to relocate to BiH for the purpose of serving as its legal counsel.

135.  OHR's California Representations related to the "length of time" of Plaintiff's work in BiH and the "kind" and "character" of his employment.

136.  In the alternative to the mutuality of intent allegations in Counts One through Five, Plaintiff alleges OHR's California Representations were not true.

137.  Also in the alternative to the mutuality of intent allegations in Counts One through Five, OHR, through the Channels of OHR's California Representations, in

particular Bruns, knew at the time OHR's California Representations were made that they were not true.

138.   By engendering and inducing Plaintiff's 2003 belief in the Mandate-Pegged, For-Cause Employment through OHR's California Representations, OHR, through the Channels of OHR's California Representations, intended to influence, persuade and/or engage Plaintiff, directly or indirectly, to relocate from California to BiH and to remain there in order to occupy the advertised vacant post of OHR Legal Counsel.

139.   Plaintiff relied on OHR's California Representations, changing his residence from California to BiH for the express purpose of working for OHR.

140.   Said reliance was justified and reasonable.  OHR was known to Plaintiff to be a reputable international organization, presided over by the preeminent international political figure, Lord Ashdown.  OHR, through its officers, particularly Bruns, had superior knowledge of OHR's intentions.  Moreover, OHR's California Representations, underlying were not isolated or one-off.  They were delivered systematically, openly and often in writing, via multiple channels and OHR officials, on several occasions, over a one-month period and occasionally in the presence of more than one OHR officer. Additionally, the terms of the Proposed 2003 Contract and the 2003 Subsidiary For-Cause Contract were consistent with OHR's California Representations, the Doig-Plaintiff Contract and the Samarah-Plaintiff Contract (hereinafter "Justified Reliance on OHR's California Representations").

141.   Plaintiff has been harmed by relying on OHR's California Representations in that he relocated from California to BiH, incurred relocation expenses, entered into an arbitrary and unstable employment relationship which he was assured would be rule-

Complaint

based and stable. By doing so, Plaintiff unwittingly exposed himself to arbitrary dismissal which eventually took place in 2007. In relying on OHR's California Representations, Plaintiff also forewent pursuit of other more stable, less arbitrary employment opportunities (hereinafter "Plaintiff's Harm Resulting From OHR's Califronia Representations").

142.   Plaintiff's reliance on OHR's California Representations constituted a substantial factor in said harm in the manner alleged above.

143.   OHR's wrongful termination in violation of public policy, as represented by Section 970, injured, harmed and embarrassed Plaintiff.

144.   As a direct, proximate and foreseeable consequence of OHR's wrongful termination in violation of public policy, as represented by Section 970, Plaintiff sustained loss, injury and damages, including lost income and benefits.

145.   OHR intentionally and wrongfully terminated Plaintiff in violation of public policy, as represented by Section 970, with an improper motive amounting to malice, in conscious disregard of Plaintiff's rights, as evidenced by the retaliatory and discriminatory conduct on the part of OHR, as alleged below. OHR acted with deliberate and wanton indifference and with recklessness and reckless disregard for the rights of Plaintiff and to the injury they would cause Plaintiff. As OHR's actions were willful, wanton, malicious and oppressive and/or violative of public policy, Plaintiff is entitled to punitive and exemplary damages.

Complaint

## COUNT NINE
### (Retaliatory Termination in Violation of Public Policy -- California Business and Professions Code Section 6077 and California Rules of Professional Conduct, Rules 1-100(D)(1), 3-110 and 3-210) (Against Both Defendants)

146.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 145 of the Complaint.

147.   Plaintiff was at all times relevant hereto an attorney licensed by the State of California.  He had a mandatory ethical duty, pursuant to Rules 3-110 and 3-210 of the California Rules of Professional Conduct (hereinafter "CRPC"), to render independent advice as to the conformity of his client's proposed or executed actions with applicable laws/rules and public policy (hereinafter "Mandatory Duties").  California Business and Professions Code section 6077 imposed upon Plaintiff during the relevant times a legal obligation to discharge the Mandatory Duties (hereinafter "Section 6077").

148.   Pursuant to Rule 1-100(D)(1) of the CRPC, the geographic scope of Plaintiff's Mandatory Duties is not subject to limitation. Therefore, Plaintiff was required to observe and discharge them even in BiH.  OHR acknowledges this fact. In his August 30, 2007 reply to Plaintiff's demand letter in this matter, OHR's Legal Counsel stated:

> I would ask that you remind Mr. Sarkis of his … obligation to the OHR as a member of the California Bar Association.

149.   On several occasions during the course of 2006 and early 2007, Plaintiff, in conformity with the Mandatory Duties and Section 6077, delivered certain advice to OHR officials, the contents of which advice are well known to OHR.

150.   The Termination and Same-Day Expulsion were in retaliation for his rendition of said advice.  No cause for the Termination was stated or established.

Complaint

The manner of both the Termination and the Same-Day Expulsion deviated substantially from OHR precedent, practice, custom and policy. The retaliatory and discriminatory Termination and Same-Day Expulsion were, accordingly, in bad faith, without justification and subversive of the public policy requiring an attorney to discharge his mandatory ethical and legal obligations.

151. Plaintiff delivered the advice alleged above prior to the Termination. The decision-making process concerning his dismissal, based on retaliatory motives, in all likelihood began prior to the 2007 Subsidiary For-Cause Contract was executed. However, OHR refrained from actually dismissing Plaintiff prior to April 13, 2007 in order to ensure that Plaintiff first completed a highly complex project involving legal agreements with six countries (hereinafter "Project"). Within days of Plaintiff's completion of the Project, he was terminated.

152. OHR's retaliatory, punitive and discriminatory Termination and Same-Day Expulsion were intentional and designed to injure, harm and embarrass Plaintiff.

153. OHR's retaliatory, punitive and discriminatory Termination and Same-Day Expulsion injured, harmed and embarrassed Plaintiff.

154. As a direct, proximate and foreseeable consequence of OHR's retaliatory, punitive and discriminatory Termination and Same-Day Expulsion, Plaintiff sustained loss, injury and damages, including lost income and benefits.

155. OHR intentionally retaliated against Plaintiff with the unlawful Termination and Same-Day Expulsion with an improper motive amounting to malice, in conscious disregard of Plaintiff's rights. OHR acted with deliberate and wanton indifference and with recklessness and reckless disregard for the rights of Plaintiff and to the injury they

would cause Plaintiff. As OHR's actions were willful, wanton, malicious and oppressive and/or violative of public policy, Plaintiff is entitled to punitive and exemplary damages.

## COUNT TEN
### (Libel by Innuendo)
### (Against Both Defendants)

156.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 155 of the Complaint.

157.   OHR, through Bruns, intentionally and without privilege published an email message concerning Plaintiff whose underlying and reasonably inferred meaning was false as it pertained to Plaintiff. Said email was libelous by innuendo in that it exposed Plaintiff to hatred, contempt, ridicule, or obloquy, or caused him to be shunned or avoided, or had a tendency to injure him in his profession and occupation.

158.   The published email was seen and read by OHR staff within the premises of OHR or wherever OHR staff members had access to their OHR email accounts, and may have been forwarded to third parties beyond OHR who also may have seen and read the same.

159.   Bruns issued said email on April 13, 2007. Therein, he announced the June 12, 2007 effective date of Plaintiff's employment at OHR. Further, the email instructed all staff to forward, as of April 13, 2007, all correspondence intended for the OHR General Counsel to Bruns or d'Aoust (hereinafter "Bruns Email").

160.   The twin written statements alleged above are capable of defamatory meaning imputed by innuendo. Read in tandem, they published that Plaintiff had been expelled. The published announcement of expulsion, in turn, insinuated, implied and

Complaint

attributed to Plaintiff acts, conditions, characteristics and conduct putatively justifying, warranting and giving rise to such an extreme responsive measure.

161.   OHR staff was aware at all relevant times that the notice period in connection with international contract terminations is two months. The Bruns Email published instruction to staff to redirect Plaintiff's correspondence between April 13, 2007, the date of the Bruns Email, and June 12, 2007, the effective date of Plaintiff's termination. Bruns thereby announced that Plaintiff would be absent from OHR during the entirety of said notice period. Only OHR staff members who are immediately expelled following termination for serious misconduct are absent from OHR during the entirety of their notice period. OHR staff was at all relevant times aware of this fact.

162.   Further, only OHR staff who are immediately expelled following termination are the subjects of general OHR emails by Bruns similar to the one dispatched in the instant case. OHR staff was at all relevant times aware that expulsion as of the day of termination had been used in the past in response to accusations of serious misconduct.

163.   It is the custom and practice within OHR that staff members not expelled issue their own emails announcing their departure. They are able to do so because they have, during the notice period, the time, the opportunity and the access to the internal OHR email system that an expelled staff member lacks. Further, they, unlike an expelled staff member, have the inclination and disposition to issue such emails. OHR staff was at all times aware of this custom and practice.

164.   The meaning by innuendo of the Bruns Email, was that Plaintiff had engaged in such grievous conduct, including duplicitous, dishonest and/or criminal acts, as to justify and warrant the Same-Day Expulsion (hereinafter "Derogatory Sense").

165.   The Derogatory Sense was false, as alleged above.

166.   Bruns knew the Derogatory Sense to be false at the time he issued the Bruns Email, as alleged above.  Alternatively, Bruns lacked probable or any cause for believing the Derogatory Sense to be true, as alleged above.

167.   Third persons in OHR and beyond were not apprised of the fact that Derogatory Sense was false because OHR did not institute a disciplinary hearing which would have vindicated Plaintiff.

168.   Bruns intended to insinuate and imply the Derogatory Sense through the Bruns Email and to apply it to Plaintiff.

169.   Bruns intended for third parties in OHR and beyond to infer the Derogatory Sense from the Bruns Email and to apply it to Plaintiff.

170.   Third Parties in OHR and beyond did so understand and infer the Bruns Email.

171.   Bruns issued the Bruns Email, containing the Derogatory Sense, with malice for the purpose of defaming the Plaintiff and interfering with his ability to obtain employment, particularly in the international organization sector in Europe, and in order to cast improperly doubt, suspicion and aspersion upon and impugn Plaintiff's legal abilities and the value and quality of his advice and skills.  Dr. Schwarz-Schilling who, Plaintiff is informed and believes, and upon such information and belief alleges, approved and ratified the issuance of the Bruns Email was moved to do so by malice for

Complaint

the purposes alleged herein. As alleged above, it was Plaintiff who, in 2003, had asked, on behalf of OHR, that Dr. Schwarz-Schilling cease and desist from his private mediation efforts in BiH. Dr. Schwarz-Schilling intended his approval and ratification of the Bruns Email as an act of retaliation and retribution against Plaintiff (hereinafter collectively "Bruns/ Schwarz-Schilling Defamation Malice").

172.   The Derogatory Sense was not privileged, as it was, among other things, published by innuendo with malice, hatred and ill will towards Plaintiff and by the desire to injure him.

173.   The Defamatory Sense injured and stigmatized Plaintiff and tended to injure and stigmatize the Plaintiff in his trade, profession and/or standing, in particular by lowering Plaintiff in the estimation of the international and governmental communities within BiH and elsewhere in Europe. The Defamatory Sense ascribed to Plaintiff conduct, characteristics and conditions that adversely affect Plaintiff's fitness for the proper conduct of the ethics-laden practice of law (hereinafter "Defamation Injury").

174.   As a direct, proximate and foreseeable consequence of the Bruns Email, Plaintiff sustained loss, injury, special and general damages, including lost income and benefits, damage to his reputation and emotional distress.

175.   Bruns' issuance of the Bruns Email was accompanied by a wrongful intention on the part of Bruns of injuring Plaintiff with an improper motive amounting to malice, in conscious disregard of Plaintiff's rights, particularly his interest in his reputation. As OHR's action, in the form of Bruns' issuance of the Bruns Email intentionally imbued with the Derogatory Sense, was willful, wanton, malicious and oppressive, Plaintiff is entitled to punitive and exemplary damages.

Complaint

## COUNT ELEVEN
### (Defamation By Conduct)
### (Against Both Defendants)

176.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 175 of the Complaint.

177.   OHR's unjustified, public and peremptory acts of the Termination and the Same-Day Expulsion (hereinafter "Conduct") intentionally published, through the conduct of Dr. Schwarz-Schilling, Bruns and d'Aoust, among others, without privilege to third parties a message, the contents of which created an impression as pertaining to and referencing Plaintiff.  Said message conveyed the impression that Plaintiff had engaged in such grievous conduct, including duplicitous, dishonest and/or criminal acts, as to justify and warrant the Termination and the Same-Day Expulsion (hereinafter "Defamatory Message").  The Defamatory Message exposed Plaintiff to hatred, contempt, ridicule, or obloquy, or caused him to be shunned or avoided, or had a tendency to injure him in his profession and occupation.

178.   The Defamatory Message caused harm and damages to Plaintiff.

179.   The Defamatory Message was false, as alleged herein.

180.   OHR, through Dr. Schwarz-Schilling, Bruns and d'Aoust, among others, knew the Defamatory Message to be false, as alleged herein.  Alternatively, Dr. Schwarz-Schilling, Bruns and d'Aoust lacked probable or any cause for believing the Defamatory Message to be true, as alleged herein.

181.   The Defamatory Message inflicted upon Plaintiff injury identical to the Defamation Injury.

Complaint

182. OHR, through Dr. Schwarz-Schilling, Bruns and d'Aoust, intended by the Defamatory Message the above-alleged injury and stigmatization of Plaintiff.

183. OHR, through Dr. Schwarz-Schilling, Bruns and d'Aoust, intended to insinuate, imply and communicate the Defamatory Message via the Conduct and to apply it to Plaintiff.

184. Dr. Schwarz-Schilling, Bruns and d'Aoust intended for third parties to infer the Defamatory Message from the Conduct and to apply it to Plaintiff.

185. Third parties did understand and infer the Defamatory Message in the manner intended by Dr. Schwarz-Schilling, Bruns and d'Aoust, particularly as OHR denied Plaintiff the benefit of a disciplinary hearing which would have vindicated him.

186. OHR, through Dr. Schwarz-Schilling, Bruns and d'Aoust, engaged in the Conduct and published the Defamatory Message with malice. Plaintiff alleges herein the Bruns/Schwarz-Schilling Defamation Malice.

187. The Defamatory Message was not privileged, as it was, among other things, animated by malice, hatred and ill will towards Plaintiff and by the desire to injure him.

188. As a direct and proximate and foreseeable consequence of the Defamatory Message delivered via the Conduct, Plaintiff has suffered loss, injury and damages, including special and general damages, and damage to his reputation within the international and governmental community within BiH and elsewhere in Europe, and emotional distress.

189. Through Dr. Schwarz-Schilling, Bruns and d'Aoust, among others, OHR intentionally issued the Defamatory Message via the Conduct with an improper motive amounting to malice, in conscious disregard of Plaintiff's rights, in particular his interest

Complaint

in his reputation. OHR, through Dr. Schwarz-Schilling, Bruns and d'Aoust, acted with deliberate and wanton indifference and with recklessness and reckless disregard for the falsity of the Defamatory Message of the Conduct and for the injury it would cause Plaintiff. As OHR's actions were willful, wanton, malicious and oppressive, Plaintiff is entitled to punitive and exemplary damages.

### COUNT TWELVE
### (Violation of California Labor Code Section 970)
### (Against Both Defendants)

190.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 189 of the Complaint and pleads this Count in the alternative to the mutuality of intent allegations in Counts One through Five.

191.   As a result of OHR's California Representations and the Termination and the Same-Day Expulsion, OHR violated Section 970.

192.   As a direct, proximate and foreseeable consequence of OHR's violation of Section 970, Plaintiff sustained loss, injury and damages, including lost income and benefits and relocation expenses, damage and injury to his professional reputation, and emotional distress.

193.   Because OHR violated Section 970, Plaintiff is entitled to double damages, pursuant to Section 972 of the California Labor Code.

### COUNT THIRTEEN
### (Violation of California Labor Code Section 2924)
### (Against Both Defendants)

194.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 193 of the Complaint.

195.   OHR did not have nor did it state or establish a legally-cognizable cause for termination of the 2007 Subsidiary For-Cause Contract.  Failure to dismiss Plaintiff with cause, as established in accordance with the governing contractual procedural steps, constitutes a violation of Section 2924, as expanded upon by the parties by the agreed terms of the 2007 Subsidiary For-Cause Contract.

196.   As a direct, proximate and foreseeable consequence of OHR's violation of Section 2924, Plaintiff sustained loss, injury and damages, including lost income and benefits, damage and injury to his professional reputation, and emotional distress.

### COUNT FOURTEEN
### (Promissory Fraud)
### (Against Both Defendants)

197.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 196 of the Complaint and pleads this Count in the alternative to the mutuality of intent allegations in Counts One through Five.

**The California Promise, The Doig-Plaintiff Contract, The Samarah-Plaintiff**

**Contract, the 2003 Subsidiary For-Cause Contract**

198.   In 2003, OHR issued the California Promise and entered into the Doig-Plaintiff Contract, the Samarah-Plaintiff Contract and the 2003 Subsidiary For-Cause Contract, as alleged herein (hereinafter collectively "OHR's 2003 Promises").

199.   OHR's 2003 Promises were material.  Plaintiff would not have uprooted from California, relocated to BiH and signed the 2003 Subsidiary For-Cause Contract had he known in 2003 that his promised employment was _not_ mandate-pegged but was instead terminable at any time before "without cause" (hereinafter "Materiality of OHR's 2003 Promises").

Complaint

200.   Among other OHR officials, Bruns made, directed to be made, authorized to be made, sanctioned, ratified or adopted through silence OHR's 2003 Promises.

201.   In the alternative to the mutuality of intent allegations of Counts One through Five, at the time OHR made OHR's 2003 Promises, OHR, through Bruns, did not intend to perform pursuant to any of said promises. Specifically, OHR, through Bruns, did not intend to honor its commitment, underlying OHR's 2003 Promises, to grant Plaintiff or to recognize the Mandate-Pegged, For-Cause Employment and the Subsidiary For-Cause Contracts subsumed therein.

202.   OHR, through Bruns, fraudulently intended that Plaintiff should rely on OHR's 2003 Promises, uproot from California, relocate to BiH and sign the 2003 Subsidiary For-Cause Contract. Through OHR's 2003 Promises, OHR, through Bruns, did deceive and did fraudulently induce Plaintiff into the above acts of intended reliance.

203.   Plaintiff relied on OHR's 2003 Promises. Among other things, Plaintiff uprooted from California, incurred relocation expenses, relocated to BiH and signed the Main Agreement.

204.   Plaintiff's reliance was reasonable and justifiable, as alleged herein in the Justified Reliance on OHR's California Representations allegation.

205.   OHR, through Bruns who was instrumental in Plaintiff's dismissal, did not perform or honor OHR's 2003 Promises, as alleged herein.

### The 2002 PPP Promise

206.   OHR delivered the 2002 PPP to Plaintiff prior to his entry into the 2003 Subsidiary For-Cause Contract. Bruns directed, authorized, sanctioned and/or had or should have had knowledge of said delivery.

Complaint

207. As the official responsible for OHR's internal operations, Bruns had or should have had knowledge of the contents of the 2002 PPP, including the 2002 PPP Promise therein.

208. At the time of the 2002 PPP Promise's delivery to Plaintiff, OHR, through Bruns, did not intend to perform on the same or to honor it in any way. Specifically, Bruns did not intend to confer upon Plaintiff the benefit of disciplinary procedures and the attendant disclosure of "cause" requirement, as guaranteed by the 2002 PPP Promise.

209. At the time of the 2002 PPP Promise's issuance, OHR, through Bruns, fraudulently intended that Plaintiff should rely on the same by believing his employment to be stable and subject to preliminary procedures prior to termination, which belief OHR, through Bruns, hoped and intended would induce Plaintiff to sign the 2003 Subsidiary For-Cause Contract and preclude rigorous effort on the part of Plaintiff to seek alternative employment.

210. Through the 2002 PPP Promise, OHR, through Bruns, deceived and fraudulently induced Plaintiff into the acts of intended reliance, as alleged herein.

211. Plaintiff relied on the 2002 PPP Promises, as alleged herein. Among other things, Plaintiff proceeded to act on his decision to enter into the 2003 Subsidiary For-Cause Contract and to refrain from active search for alternative employment.

212. Plaintiff's reliance was reasonable and justifiable, as alleged herein. Specifically, the 2002 PPP Promise was consistent with the Samarah 2003 Representation and the Doig 2003 Representation. The 2002 PPP represented the published and publicly-avowed internal policies of OHR. Plaintiff had no reason to believe that OHR would not abide by them.

Complaint

213. The 2002 PPP Promise was material in the manner alleged herein.

214. OHR did not perform or honor the 2002 PPP Promise, as alleged herein.

### The Post-Arrival Promises

215. The d'Aoust Representation, the Retention Bonus Policy Representation and the Liquidation Team Offer were made in the manner alleged herein and constituted promises by and on behalf of OHR of the Mandate-Pegged, For-Cause Employment.

216. At Bruns' behest, direction and/or with his authorization, sanction, ratification and/or full knowledge, the Retention Bonus Policy Representation was communicated to Plaintiff by the OHR department managed by Bruns.

217. The Liquidation Team Offer was communicated in writing to Plaintiff via an offer letter signed by Bruns.

218. At the time OHR made the Post-Arrival Promises OHR, through Bruns and d'Aoust, did not intend to perform pursuant to or honor said promises. Specifically at that time, OHR, through Bruns and d'Aoust, did not intend to grant Plaintiff or recognize the Mandate-Pegged, For-Cause Employment.

219. OHR, through Bruns and d'Aoust, fraudulently intended that Plaintiff should rely on the Post-Arrival Promises, as alleged herein, by, for example, continuing to work at OHR and foregoing active search for alternative employment.

220. Through the Post-Arrival Promises, OHR, through Bruns and d'Aoust, deceived and fraudulently induced Plaintiff into the acts of intended reliance.

221. Plaintiff relied on the Post-Arrival Promises. Among other things, he remained with OHR and did not undertake an accelerated search for more secure employment.

Complaint

222. Plaintiff's reliance was reasonable and justifiable. The d'Aoust Representation was communicated to Plaintiff repeatedly and before witnesses. The Retention Bonus Policy Representation and the Liquidation Team Offer were delivered to Plaintiff formally, overtly and in writing. The Retention Bonus Policy, in particular, was delivered amid much fanfare. Plaintiff had no reason to believe such publicly-avowed promises were in fact false.

223. The Post-Arrival Promises were material in the manner alleged herein.

224. OHR did not perform or honor the Post-Arrival Promises as alleged herein.

### The 2006 Subsidiary For-Cause Contract

225. In 2005, OHR, through Bruns, directed, authorized, ratified, sanctioned and/or had knowledge or should have had knowledge of OHR's execution and delivery to Plaintiff of the 2006 Subsidiary For-Cause Contract. In 2005, d'Aoust requested and proposed, as part of his annual departmental budgetary proposal, the issuance of the 2006 Subsidiary For-Cause Contract to Plaintiff. Both Bruns and d'Aoust were aware of the contents of the 2006 Subsidiary For-Cause Contract, as, among other things, it was identical to the ones they received and executed.

226. The 2006 Subsidiary For-Cause Contract incorporated by reference the 2003 PPP. Item 35 of the 2003 PPP constituted the Evaluation Promise, as described above. As such, said promise constituted an integral part of the 2006 Subsidiary For-Cause Contract, as well as being a constituent part of the independently-standing PPP.

227. Accordingly, Bruns and d'Aoust made, directed or requested to be made, authorized and/or sanctioned the Evaluation Promise on behalf of OHR to Plaintiff through their issuance to Plaintiff of the 2006 Subsidiary For-Cause Contract.

228.  OHR, through Bruns and d'Aoust, failed to honor the Evaluation Promise. No performance evaluation took place in 2006.  Both Bruns and d'Aoust were responsible for ensuring that said evaluation took place.

229.  Plaintiff relied on the Evaluation Promise.  He discharged his duties in 2006 on the assumption that any purported shortcomings – and any concomitant need for remedial measures – would be brought to his attention by means of the 2006 Performance Evaluation.  Specifically, Plaintiff relied on the Evaluation Promise and assumed and believed that, in the absence of the December 1, 2006 evaluation, OHR was satisfied with his conduct.  He thereupon, among other things, continued with the completion and delivery of the Project in 2007.  Lulled into this false sense of security, Plaintiff did not take any remedial/preventative steps which might have precluded the Termination.

230.  OHR, through Bruns and d'Aoust, intended the above acts of reliance. Bruns and d'Aoust's twin aim was to secure the Project and terminate Plaintiff.  By deceitfully and fraudulently inducing Plaintiff's reliance on the Evaluation Promise without actually performing the requisite 2006 Performance Evaluation, OHR achieved both objectives.

231.  The Evaluation Promise was material, as alleged herein.

232.  At the time OHR made the Evaluation Promise in 2005, OHR, through Bruns and d'Aoust, did not intend to perform pursuant to or honor said promise. Specifically, OHR, through d'Aoust, did not in 2005 intend to evaluate Plaintiff in 2006. At the time OHR issued the Evaluation Promise, Bruns had knowledge that d'Aoust did not intend to and would not evaluate Plaintiff in 2006.  Yet Bruns did not intend, at the time of the issuance of the Evaluation Promise, to take action, on behalf of OHR, to

Complaint

compel d'Aoust to evaluate Plaintiff in 2006. In the event, Bruns took no such action. Consequently, the 2006 Performance Evaluation of Plaintiff did not take place.

**The 2007 Subsidiary For-Cause Contract**

233.   In 2006, OHR, through Bruns, directed, authorized, ratified and/or sanctioned the execution and delivery to Plaintiff of the 2007 Subsidiary For-Cause Contract, as alleged in the same manner as in connection with the 2006 Subsidiary For-Cause Contract.

234.   The 2007 Subsidiary For-Cause Contract subsumed the 2007 Promise by means of its Dismissal Provisions, as alleged herein. The express terms of the 2007 Subsidiary For-Cause Contract further augmented said promise, since the contract was subject to Section 2924 of the California Labor Code and was devoid of "at will employment" or "without cause" termination language. Accordingly, the 2007 Subsidiary For-Cause Contract constituted a clear promise by OHR, through Bruns and d'Aoust, to Plaintiff that it would terminate his employment only upon a showing of cause as established in a manner consistent with the appropriate disciplinary modalities (hereinafter "2007 Subsidiary For-Cause Contract Promise").

235.   The 2007 Subsidiary For-Cause Contract Promise was material. Had the draft 2007 Subsidiary For-Cause Contract, delivered to Plaintiff in 2006, reflected a conversion of Plaintiff's employment into an "at will" one, Plaintiff would have, among other things, initiated steps in 2006 to bolster his position. As he had not completed the Project and delivered it to OHR in 2006, Plaintiff's bargaining position in this regard would have been far superior in 2006 to that at the time of the Termination.

44

Complaint

236. At the time OHR made the 2007 Subsidiary For-Cause Contract Promise, OHR, through Bruns and d'Aoust, did not intend to perform it, as alleged above.

237. OHR, through Bruns and d'Aoust, intended deceitfully and deceptively that Plaintiff should rely on the 2007 Subsidiary For-Cause Contract Promise and remain with OHR -- under the false assumption that he could not be terminated arbitrarily -- until such time as he had completed and delivered the Project, whereupon OHR would terminate him arbitrarily.

238. Plaintiff relied on the 2007 Subsidiary For-Cause Contract Promise. He carried out his duties in a straightforward and professional manner, confident that, if any objection to the same arose, he would be given warnings and ultimately afforded the opportunity, pursuant to the 2007 Subsidiary For-Cause Contract Promise, to answer successfully the case against him in a disciplinary hearing.

239. Plaintiff reliance on the 2007 Subsidiary For-Cause Promise was reasonable and justified, as alleged herein. The terms of the 2007 Subsidiary For-Cause Contract Promise were clearly memorialized and published. The 2007 Subsidiary For-Cause Contract also mirrored its four predecessors encompassing as many years, during which time Plaintiff received not the slightest indication that his employment was at will and could be terminated without cause. Finally, the terms of 2007 Subsidiary For-Cause Contract Promise, as reasonably understood by Plaintiff, were consistent with OHR's past practice, precedent, conduct and custom.

240. OHR, through Bruns and d'Aoust who were instrumental in Plaintiff's dismissal, did not perform or honor the 2007 Subsidiary For-Cause Contract Promise, as alleged herein.

Complaint

241.   Plaintiff's reliance on OHR's 2003 Promises, the 2002 **PPP Promises**, the Post-Arrival Promises, the Evaluation Promise and the 2007 Subsidiary For-Cause Contract Promise caused Plaintiff substantial detriment, as alleged herein.

242.   As a direct, proximate and foreseeable consequence of OHR's intention not to perform on OHR's 2003 Promises, the 2002 PPP Promise, the Post-Arrival Promises, the 2006 Subsidiary For-Cause Contract Promise and the 2007 Subsidiary For-Cause Contract Promise and its actual failure so to perform, Plaintiff sustained loss, injury and damages, including lost income and benefits and relocation costs, and emotional distress.

243.   OHR's intention not to perform on OHR's 2003 Promises, the 2002 PPP Promise, the Post-Arrival Promise, the 2006 Subsidiary For-Cause Contract Promise and the 2007 Subsidiary For-Cause Contract Promise and its actual failure so to perform as alleged herein was accompanied by a wrongful intention on the part of Bruns and d'Aoust of injuring Plaintiff with an improper motive amounting to malice, in conscious disregard of Plaintiff's rights. As OHR's actions, through those of Bruns and d'Aoust, were willful, wanton, malicious and oppressive, Plaintiff is entitled to punitive and exemplary damages.

### COUNT FIFTEEN
### (Intentional Misrepresentation of Material Fact)
### (Against Both Defendants)

244.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 243 of the Complaint and pleads this Count in the alternative to the mutuality of intent allegations in Counts One through Five.

Complaint

## OHR's California Representations

245.  OHR, through Bruns, among others, made OHR's California Representations (excepting Bruns Interview Silence and Bruns 2003 Silence) to Plaintiff, as alleged herein.

246.  OHR's California Representations were false, as alleged herein.  OHR, through Bruns, had knowledge of their falsity, as alleged herein.

247.  OHR, through Bruns, knew of these representations' falsity but did not disclose said fact to Plaintiff.

248.  Plaintiff was otherwise unaware of the falsity of OHR's California Representations.

249.  OHR's California Representations were material, as alleged herein.

250.  By making and/or directing or authorizing to be made, ratifying and/or adopting through silence the false OHR's California Representations to Plaintiff, Bruns, and, therefore, OHR, fraudulently and deceitfully intended to induce Plaintiff to rely on same, as alleged herein.

## The 2002 PPP as Misrepresentations

251.  OHR, through Bruns, directed, authorized, sanctioned or possessed actual knowledge of the delivery of OHR's 2002 PPP to Plaintiff prior to his entry into the 2003 Subsidiary For-Cause Contract.  These contained OHR's 2002 PPP Representations.

252.  OHR's 2002 PPP Representations constituted affirmative representations by OHR of facts alleged herein.

253.  OHR, through Bruns, intended OHR's 2002 PPP Representations to be communicated to Plaintiff.

Complaint

254.   OHR's 2002 PPP Representations were in fact false, as alleged herein.

255.   OHR, through Bruns, had knowledge that OHR's 2002 PPP Representations were false, as alleged herein.

256.   Bruns did not disclose to Plaintiff the falsity of OHR's 2002 PPP Representations.

257.   Plaintiff was otherwise unaware of said falsity.

258.   OHR, through Bruns, fraudulently and deceitfully intended to induce Plaintiff into relying on OHR's 2002 PPP Representations, as alleged herein.

259.   Bruns intentionally and fraudulently induced Plaintiff into entering into the 2003 Subsidiary For-Cause Contract.

260.   OHR's misrepresentations in the form of OHR's 2002 PPP Representations were material, as alleged herein.

## The Post-Arrival Representations

261.   The d'Aoust Representation, the Retention Bonus Policy Representation and the Liquidation Team Offer constituted affirmative representations by and on behalf of OHR, through Bruns and d'Aoust, to Plaintiff of the existence of the Mandate-Pegged, For-Cause Employment (hereinafter "Post-Arrival Representations").

262.   The Post-Arrival Representations were in fact false.  Bruns and d'Aoust had knowledge of their falsity.

263.   Neither Bruns nor d'Aoust disclosed the fact of said falsity to Plaintiff. Plaintiff was otherwise unaware of the same.

264.   OHR, through Bruns and d'Aoust, fraudulently intended to induce Plaintiff into relying on the Post-Arrival Representations in the manner alleged herein.

265.   Plaintiff's reliance was reasonable and justifiable in the manner alleged herein.

266.   Through the Post-Arrival Representations, OHR deceived and fraudulently induced Plaintiff into the acts of intended reliance in the manner alleged herein.

267.   OHR's Post-Arrival Representations were material in the manner alleged herein.

### 2006 Subsidiary For-Cause Contract as Misrepresentation

268.   The 2006 Subsidiary For-Cause Contract incorporated by reference the 2003 PPP which contained the Evaluation Promise.  Said promise constituted an affirmative representation of fact by OHR to Plaintiff, as alleged herein (hereinafter "2006 Representation").

269.   OHR, through its officers, specifically Bruns and d'Aoust, made, directed to be made, authorized to be made, sanctioned, ratified or adopted through silence the 2006 Representation, as alleged herein.

270.   The 2006 Representation was false, as alleged herein.  Bruns and d'Aoust had knowledge of said falsity, as alleged herein.

271.   Neither Bruns nor d'Aoust communicated to Plaintiff the falsity of the 2006 Representation.

272.   Plaintiff was otherwise unaware of said falsity.

273.   The 2006 Representation was material, as alleged herein.

274.   At the time OHR made the 2006 Representation in 2005, OHR, through Bruns and d'Aoust, did not intend to initiate or ensure the 2006 Performance Evaluation, as alleged herein

Complaint

275.   At the time the 2006 Representation was made, OHR, through Bruns and d'Aoust, intended that Plaintiff should rely on the same, as alleged herein.

276.   Through the 2006 Representation, OHR deceived and induced Plaintiff into the acts of intended reliance, as alleged herein.

## 2007 Subsidiary For-Cause Contract as Misrepresentation

277.   Bruns and d'Aoust, acting on behalf of and for OHR, directed, requested, proposed, ratified and/or authorized OHR's execution of the 2007 Subsidiary For-Cause Contract and delivery of the half-executed draft to Plaintiff for his signature (hereinafter "2007 Draft"), as alleged herein.

278.   The 2007 Draft contained the Dismissal Provisions   It also contained a duration clause and the Notice Provision.

279.   These facts constituted affirmative representations of fact to Plaintiff in the manner alleged herein (hereinafte the "2007 Representations").

280.   The 2007 Representations were, in fact, false.  OHR, through Bruns and d'Aoust, knew them to be false but did not disclose this fact to Plaintiff.  Plaintiff was otherwise unaware of the falsity of the 2007 Representations.

281.   OHR, through Bruns and d'Aoust, did not intend to execute, implement or abide by the 2007 Representations, as alleged herein.

282.   The 2007 Representations were material in the manner alleged herein.

283.   By directing, proposing, requesting, authorizing, ratifying and/or sanctioning the 2007 Representations to be made to Plaintiff, Bruns and d'Aoust, and, therefore, OHR, fraudulently and deceitfully intended to induce Plaintiff to rely on said representations, as alleged herein.

Complaint

284.  Plaintiff relied on OHR's California Representations, OHR's 2002 PPP

Representations, the Post-Arrival Representations, the 2006 Representation and the 2007

Representations, as alleged herein.

285.  Plaintiff's reliance was justified, as alleged herein.

286.  Plaintiff's reliance on OHR's California Representations, OHR's 2002 PPP

Representations, the Post-Arrival Representations, the 2006 Representation and the 2007

Representations redounded to his substantial detriment, as alleged herein.

287.  As a direct, proximate and foreseeable consequence of OHR's

misrepresentations through Bruns, in the form of OHR's California Representations,

OHR's 2002 PPP Representations, the Post-Arrival Representations, the 2006

Representations and the 2007 Representations, Plaintiff sustained loss, injury and

damages, including lost income and benefits, relocation expenses and emotional distress.

288.  OHR, through Bruns and d'Aoust, intentionally misrepresented material

facts as alleged herein with the wrongful intention on the part of Bruns and d'Aoust of

injuring Plaintiff with an improper motive amounting to malice, in conscious disregard of

Plaintiff's rights.  As OHR's actions, through those of Bruns and d'Aoust, were willful,

wanton, malicious and oppressive, Plaintiff is entitled to punitive and exemplary

damages.

**COUNT SIXTEEN**
**(Negligent Misrepresentation of Material Fact)**
**(Against Both Defendants)**

289.  Plaintiff adopts and incorporates by reference as if specifically set forth

herein the averments of paragraphs one through 288 of the Complaint and pleads this

Count in the alternative to the mutuality of intent allegations in Counts One through five.

51                                    Complaint

290.  OHR made the false OHR's California Representations, OHR's 2002 PPP Representations, the Post-Arrival Representations, the 2006 Representations and the 2007 Representations negligently and without a reasonable basis for believing them to be true.

291.  By negligently making the false OHR's California Representations, OHR's 2002 PPP Representations, the Post-Arrival Representations, the 2006 Representations and the 2007 Representations to Plaintiff, OHR intended to induce Plaintiff to rely upon said representations, as alleged herein.

292.  As a direct, proximate and foreseeable consequence of OHR's negligent misrepresentations, as alleged herein, in the form of OHR's California Representations, OHR's 2002 PPP Representations, the Post-Arrival Representations, the 2006 Representations and the 2007 Representations, Plaintiff sustained loss, injury and damages, including lost income, benefits and relocation expenses, and emotional distress.

### COUNT SEVENTEEN
### (Intentional Suppression of Material Fact)
### (Against Both Defendants)

293.  Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 292 of the Complaint and pleads this Count in the alternative to the mutuality of intent allegations in Counts One through Five.

294.  Through OHR's status as Plaintiff's prospective and present employer; OHR's role in soliciting and inducing Plaintiff to leave his state of residence in favor of BiH; OHR's knowledge of Plaintiff's vulnerability, arising in part from his ignorance of the true facts underlying OHR's California Representations and its other misrepresentations and concealments, as alleged herein; OHR's superior knowledge with respect to its true intentions regarding Plaintiff's employment; OHR's disbursement of

Complaint

incomplete material information to Plaintiff; Plaintiff's dependence in a foreign country on OHR; and OHR's contractual obligations to act affirmatively to assist Plaintiff, *e.g.,* by providing warnings and annual performance evaluations, OHR owed a duty of care and fiduciary duty to act in the best interests of Plaintiff, as alleged herein (hereinafter "Duties").

295.   OHR, through the deliberate and deceitful conduct and intent of Bruns and/or d'Aoust breached the Duties in the manner alleged herein.

### 2003 Suppression

296.   When:  (A) making the OHR's California Representations; (B) dispatching the OHR Offer to Plaintiff for his acceptance; (C) dispatching the Proposed 2003 Contract; (D) entering into the Umbrella Agreement; and (E) tendering the 2003 Subsidiary For-Cause Contract, accompanied by the 2002 PPP, for Plaintiff's signature, OHR, through Bruns, intentionally concealed from and failed to disclose to Plaintiff the true facts, as known to OHR, through Bruns, at that time, *i.e.,* that OHR did not recognize and did not intend to recognize the Mandate-Pegged, For-Cause Employment or the disciplinary procedures associated therewith (hereinafter " Concealed Facts I").

297.   Bruns intentionally suppressed Concealed Facts I with the intention of fraudulently inducing Plaintiff to uproot from California, relocate to BiH, join OHR and contribute significantly thereto.

298.   Plaintiff did act in reliance in the manner intended by Bruns, as alleged herein.

299.   Plaintiff was unaware of the Concealed Facts I prior to the date of his termination.

Complaint

300.  Concealed Facts I were material.  Had Plaintiff been aware of Concealed Facts I prior to his termination date, Plaintiff would have acted differently, as alleged herein.  By way of example, he would not have relocated from California to BiH.

301.  Plaintiff suffered injury and damages as a result of OHR's intentional suppression of Concealed Facts I, as alleged herein.

### 2006 Suppression

302.  OHR, through d'Aoust, Plaintiff's supervisor, intentionally concealed in 2006 and 2007 from Plaintiff material information concerning OHR's view of Plaintiff's conduct and/or its intentions regarding Plaintiff's continued employment which evidently was sufficiently negative to warrant the Termination in 2007 (hereinafter "Concealed Fact II").  D'Aoust did so by intentionally failing to provide to Plaintiff the 2006 Performance Evaluation.

303.  In this connection, OHR, through Bruns, the official in charge of OHR's internal operations, also intentionally suppressed Concealed Fact II.  He did so by failing intentionally to ensure that d'Aoust discharged OHR's contractual obligation to provide to Plaintiff the requisite performance evaluation.

304.  Alternatively, Bruns and d'Aoust jointly agreed, colluded or conspired to defer indefinitely Plaintiff's 2006 evaluation in order intentionally to suppress the Concealed Fact II.

305.  At the time OHR entered into the 2006 Subsidiary For-Cause Contract in 2005 or at any time thereafter until December 1, 2006, OHR, through Bruns and d'Aoust, did not intend for OHR to provide the 2006 Performance Evaluation.  OHR, through Bruns and d'Aoust, intentionally suppressed the Concealed Fact II with the deliberate and

Complaint

deceitful intention of inducing Plaintiff into the acts alleged herein, for example, in connection with the Evaluation Promise.

306. Plaintiff did so act in reliance, as alleged herein.

307. In the absence of the 2006 Performance Evaluation, Plaintiff was unaware of the Concealed Fact II.

308. Said ignorance of fact was material. Had Plaintiff been aware of Concealed Facts II, he would have taken different action, as alleged herein.

309. Plaintiff suffered injury and damages as a result of OHR's intentional suppression of Concealed Facts II, as alleged herein, for example, in connection with the Evaluation Promise.

### 2007 Suppression

310. When tendering the 2007 Subsidiary For-Cause Contract for Plaintiff's signature, OHR, through Bruns and d'Aoust, concealed from and failed to disclose to Plaintiff the true facts, as known to OHR, through Bruns and d'Aoust, at that time, to wit, that: (A) OHR did not recognize and did not intend to recognize the Mandate-Pegged, For-Cause Employment or the Dismissal Provisions of the Subsidiary For-Cause Contracts; (B) OHR, through Bruns and d'Aoust, deemed that Plaintiff could be expelled from OHR premises before the effluxion of the two-month termination notice period stipulated in the 2007 Subsidiary For-Cause Contract; and/or (C) OHR had partially or entirely decided to terminate Plaintiff (hereinafter collectively "Concealed Facts III").

311. OHR's failure to disclose Concealed Facts III was intentional, as represented by Bruns and d'Aoust's intentions.

Complaint

312.   OHR, through Bruns and d'Aoust, intentionally failed to disclose Concealed Facts III with the fraudulent intent of deceiving and inducing Plaintiff to enter into the 2007 Subsidiary For-Cause Contract, to remain with OHR until he had completed and delivered to OHR the Project, and not to take any preventative steps to avert his planned termination.

313.   Plaintiff did act in reliance in the manner intended by Bruns and d'Aoust and, therefore, by OHR, as alleged herein.

314.   Plaintiff was unaware of the Concealed Facts III.

315.   Said ignorance of Concealed Facts III was material.  Had Plaintiff been aware of said facts, he would have acted in the different manner alleged herein.

316.   Plaintiff suffered injury and damages as a result of OHR's intentional suppression of Concealed Facts III, as alleged herein.

317.   As a direct, proximate and foreseeable consequence of OHR's intentional suppression of material facts, to wit, Concealed Facts I, Concealed Fact II and Concealed Facts III, Plaintiff sustained loss, injury and damages, including lost income and benefits and relocation expenses, and emotional distress.

318.   OHR, through Bruns and d'Aoust, intentionally concealed and failed to disclose material facts as alleged herein with the wrongful intention of injuring Plaintiff with an improper motive amounting to malice, in conscious disregard of Plaintiff's rights. As OHR's intentional omissions, as represented by Bruns and d'Aoust's intentional omissions, were willful, wanton, malicious and oppressive, Plaintiff is entitled to punitive and exemplary damages.

Complaint

## COUNT EIGHTEEN
### (Negligent Suppression of Material Fact)
### (Against Both Defendants)

319.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 318 of the Complaint and pleads this Count in the alternative to the mutuality of intent allegations in Counts One through Five.

320.   OHR owed Plaintiff the Duties.

321.   OHR breached the Duties by negligently and with reckless disregard failing to disclose Concealed Facts I, Concealed Fact II and Concealed Facts III.  OHR should have realized and was negligent in not realizing that its nondisclosure involved an unreasonable risk of causing injury to Plaintiff.

322.   As a direct, proximate and foreseeable consequence of OHR negligent failure to disclose material facts, to wit, Concealed Facts I, Concealed Fact II and Concealed Facts III, Plaintiff sustained loss, injury and damages, including lost income and benefits and relocation expenses, and emotional distress.

## COUNT NINETEEN
### (Intentional Infliction of Emotional Distress)
### (Against Both Defendants)

323.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 322 of the Complaint and pleads the allegations in this Count relative to OHR's fraudulent conduct in the alternative to the mutuality of intent allegations in Counts One through Five.

324.   Through the conduct alleged herein, OHR intended to cause Plaintiff severe emotional distress or was in reckless disregard of the probability of causing him emotional distress.  Said conduct was extreme and outrageous and exceeded all bounds of

Complaint

that usually tolerated in a civilized community. Plaintiff suffered severe or extreme emotional distress. Said emotional distress was accompanied and evidenced by acute physical manifestations which required medical and dental attention in the aftermath of his dismissal. OHR's outrageous conduct was the actual and proximate causation of the emotional distress suffered by Plaintiff.

325. In particular, the unjustified Same-Day Expulsion of Plaintiff, in which Bruns intentionally and without necessity or justification involved the OHR Head of Security, compounded Plaintiff's anguish, anxiety, humiliation, mortification and emotional distress. In addition to tainting, damaging and besmirching Plaintiff's reputation, character and name within OHR and the wider governmental and international organization community in BiH and elsewhere in Europe, said expulsion led to the rupture of personal relations with his friends and colleagues in OHR and forced him to leave behind many cherished personal effects which have since been lost.

326. In addition, OHR intentionally concealed or misrepresented its intention to terminate Plaintiff, to his detriment, for a considerable period of time, dating back at least to prior to the execution date of the 2007 Subsidiary For-Cause Contract. By then, some of the events underlying the Retaliatory Termination Count, *supra*, had occurred. Throughout the intervening period, OHR intended to terminate Plaintiff, or had initiated the related decision-making process, but refrained from effecting said termination until April 13, 2007 in order to achieve surreptitiously its deliberate and deceptive design to ensure that Plaintiff first completed the Project. In furtherance of this deceitful design, OHR did not issue the required warnings or initiate the equally-requisite 2006 Performance Evaluation, either or both of which might have brought to Plaintiff's

Complaint

attention material facts which might have prompted preventative measures on his part, which measures, in turn, might have precluded the Termination and Same-Day Expulsion.

327.  Moreover, OHR intentionally misrepresented to and concealed from Plaintiff throughout his employment and even during the interview/negotiation stage in California that his employment in a foreign country could be terminated peremptorily, suddenly, discriminatorily and in violation of governing contracts, as alleged herein.

328.  OHR's duplicitous and deceitful design and conduct, as alleged above, went beyond the act of termination.

329.  The Termination and Same-Day Expulsion were discriminatory.  Plaintiff was denied rights accorded to other previously-terminated OHR staff members, specifically the right to a stated cause and the adjudication of the same by the OHR Disciplinary Committee.

330.  As a result of the aforesaid conduct by OHR, a fundamental interest of Plaintiff was violated in a deceptive, discriminatory and self-serving manner over a period long before the actual termination.  Said interest was the peaceful enjoyment of a property right in employment contracts, guaranteeing the protections alleged herein.

331.  OHR's deceptive, self-serving and discriminatory acts resulted in severe emotional injuries to Plaintiff and exceeded the normal risks inherent in the employment relationship which an employee is expected to assume.  OHR's fraudulent and discriminatory conduct fell outside its proper role as an employer, exceeded the normal scope of the employment relationship, had an extremely tenuous nexus thereto and/or went beyond and was attenuated from normal management or business practices.

Complaint

332.   As a direct, proximate and foreseeable consequence of OHR's intentional infliction of emotional distress upon Plaintiff, Plaintiff sustained loss, injury and damage, including embarrassment, depression, mortification, humiliation, anxiety, fear, agitation, severe emotional distress and physical injury.

333.   OHR committed the acts alleged in this complaint with the wrongful intention of injuring Plaintiff with an improper motive amounting to malice, in conscious disregard of Plaintiff's rights.  As OHR's actions were willful, wanton, malicious and oppressive, Plaintiff is entitled to punitive and exemplary damages.

## COUNT TWENTY
### (Negligent Infliction of Emotional Distress)
### (Against Both Defendants)

334.   Plaintiff adopts and incorporates by reference as if specifically set forth herein the averments of paragraphs one through 333 of the Complaint and pleads the allegations in this Count relating to OHR's fraudulent conduct in the alternative to the mutuality of intent allegations in Counts One through Five.

335.   OHR owed Plaintiff the Duties.

336.   OHR negligently committed the acts herein alleged and thereby caused Plaintiff to suffer fear, depression, anxiety, humiliation, disgrace, embarrassment, mortification, mental anguish, and sever physical and emotional distress, directly and proximately causing damage to Plaintiff.

337.   By the actions alleged herein, OHR breached the Duties to Plaintiff, directly and proximately causing harm and damage to Plaintiff.

WHEREFORE, by all these presents, counsel for Plaintiff demands:

Complaint

1.  Judgment in favor of Plaintiff and against Defendants as to compensatory damages in an amount to be determined at trial;

2.  An award of punitive damages in an amount to be determined at trial in connection with Counts Eight, Nine, Ten, Eleven, Fourteen, Fifteen, Seventeen and Nineteen of the Complaint;

3.  An award of double damages in connection with Count Twelve, pursuant to Section 972 of the California Labor Code;

4.  An award of attorneys fees;

5.  An award of prejudgment interest and costs; and

6.  Such other relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

4/9/08

Jeffrey M. Forster
Law Offices of Jeffrey M. Forster
160 West Santa Clara Street
Suite 1100
San Jose, CA 95113

Attorney for Plaintiff Anthony Sarkis

08-03-28 Email Sarkis to Doig (2).txt
From: Anthony Sarkis [sarkis90025@yahoo.com]
Sent: Friday, March 28, 2003 3:34 AM
To: Ian Doig
Subject: Re: FW: Contract package

Dear Mr. Doig:

Thank you for your kind reply.  I seemed to have
conveyed the wrong impression -- no doubt the result
of poor composition skills.  I never intended to press
for an "indefinite duration" arrangement.  Rather,
I was suggesting a way of softening the impact to one
party in the event the other decided in silence not to
renew the annual contract.  Absent the proposed notice provision, I, for instance,
could theoretically be facing uncertainty until 30 December and unemployment on the
31st.  Apart from generating discomfiture, this sequence would also cause the loss
of my accrued vacation.  In any event, your reassuring words have persuaded me that
additional contractual language is
unnecessary, provided we both recognize that this
issue is of some import to me.  I wouldn't be planning
a career with the OHR if I lacked confidence in its
good faith.  I look forward to meeting you and all my
other colleagues in April.

Best regards,
Anthony
--- Ian Doig <ian.doig@ohr.int> wrote:
>
>
> -----Original Message-----
> From: Ian Doig
> Sent: Thursday, March 27, 2003 4:42 PM
> To: 'sarkis900255@yahoo.com'
> CC: Sunita Samarah; Gisbert Bruns
> Subject: FW: Contract package
>
>
> Dear Anthony
> Under normal circumstances, I would clear this reply
> with Counsel but
> obviously ...
>
> Until 6 months ago, all OHR contracts ended on 31/12
> each year and were then
> renewed for a further year unless there was good
> cause not to. This was a
> restriction imposed on OHR by the Peace
> Implementation Council (PIC).
> At the end of last year, we obtained PIC agreement
> to transfer all National
> staff onto "without limit of time" contracts.  The
> situation for
> International contracts remained unchanged for
> reasons which I will excplain
> to you when you arrive.
>
> You may or may not then wish to embark upon the
> process of trying to change
> the basis of International contracts.
>
> Until that time, we are bound by our rules to offer
> you a contract
> terminating on 31/12/03.

Page 1



08-03-28 Email Sarkis to Doig (2).txt

> You are absolutely correct in your assumption about
> good faith.  Our
> intention is that we will still be colleagues in
> 2004.
>
> Ian Doig
> Head of Personnel
>
> -----Original Message-----
> From: Sunita Samarah
> Sent: Thursday, March 27, 2003 8:55 AM
> To: Ian Doig
> Subject: FW: Contract package
>
>
>
>
> -----Original Message-----
> From: Anthony Sarkis [mailto:sarkis90025@yahoo.com]
> Sent: Thursday, March 27, 2003 7:41 AM
> To: Sunita Samarah
> Subject: Re: Contract package
>
>
> Dear Ms. Samarah:
>
> I have reviewed the draft contract you kindly
> forwarded to me.  For the most part, it is
> acceptable.
>  However, the absence of one critical provision,
> i.e.,
> the "Notice of Non-Renewal" clause, gives rise to a
> measure of concern.  Obviously, neither OHR nor I
> would be keen to learn for the first time on 30
> December that the other party is not interested in
> contract renewal.  To protect both parties'
> interests,
> I suggest the addition of  language closely tracking
> the "Termination" clause, perhaps reducing the
> notice
> period in the context of non-renewal to one month.
>
> I have every confidence that both parties are
> negotiating this contract in good faith with the
> intent to renew our promising association so long as
> the OHR's mandate and the parties' satisfaction with
> the relationship continue.  I am equally certain
> that
> neither party will prejudice the interests of the
> other even in extreme circumstances and in the
> absence
> of protective contractual language.  However,
> neither
> party should be content to leave matters to chance
> --
> hence the proposed addition.
>
> As this issue is of profound significance, I would
> be
> grateful to receive your response prior to my
> arrival
> in Sarajevo, preferably by Friday, 28 March 2003.
                              Page 2

08-03-28 Email Sarkis to Doig (2).txt

> I look forward to hearing from you.  Thank you for
> your courtesy and consideration.
>
> Best regards,
> Anthony
> --- Sunita Samarah <sunita.samarah@ohr.int> wrote:
> >
> >
> > Dear Mr. Sarkis,
> >
> > Once you are here, you will sign the full contract
> package, not only an
> > employment contract. However, enclosed please find
> a
> copy of your contract
> > which you will sign on your first day at work. In
> > addition, please find
> > print-out from the OHR intranet site of renting
> > houses.
> >
> > Regards,
> > Sunita
> >
> >
>
> ------------------------------------------------------------
> > ----
> > House for rent (Posted by Almedina Kovacevic on 21
> > Mar 2003)
> > Nicely decorated, 4 bedrooms, 2 bathrooms, living
> > room, kitchen beautiful
> > garden, parking space, garage, gas heating. Price negotiable. Tel:
> > 033/510-692 Mob: 061/702-115
> >
>
> ------------------------------------------------------------
> > ----
> > Breka - apartment for rent (Posted by Sanja Haller
> > on 21 Mar 2003)
> > Apartment for rent (or sale)- Breka spacious, 4
> > bedroom apartment (90 m2),
> > fully furnished, beautiful view. call 219-465 or 061-803-564
> >
>
> ------------------------------------------------------------
> > ----
> > Flat for rent (Posted by Biljana Potparic on 20
> Mar
> > 2003)
> > In the center of Sarajevo (Branilaca grada
> Street),
> > IV floor, 2 rooms,
> > kitchen completely new, fully and tastefully
> > furnished and equipped (TV,
> > satellite, own central heating system,
> > air-conditioning system). contact
> > phone: 061/134 930 (also English lang. speaking)
> >
>
> ------------------------------------------------------------
> > ----
> > nice apartment for rent (Posted by Vesna
> Hadzikaric

Page 3

08-03-28 Email Sarkis to Doig (2).txt
```
> > on 20 Mar 2003)
> > spacious apartment in building called "Karingtonka",Kranjceviceva
> > street, 1 floor 100m2, half furnished, 3 bedrooms, 2
> > bathrooms, 1 toilet, own modern
> > heating system, a garage behind the building.
> > contact phones: 061/352-568
> > ili 061/214-626, Amira Dostic
> >
>
---------------------------------------------------------------------------
> > ----
> > Apartment for rent (Posted by Dzanela Mrsevic on
> 19
> > Mar 2003)
> > 2,5 rooms apartment is available for rent in
> > Alipasino polje (Trg
> > Nezavisnosti 17). For further information, please
> > contact Sejda at 679-451
> > (Bosnian only)
> >
>
---------------------------------------------------------------------------
> > ----
> > House for rent (Posted by Dijana Susa on 19 Mar
> > 2003)
> > House for rent in old part of town (Sedrenik),
> 1300
> > m from Bascarsija, big
> > garden, garage. Wondeful view. Possibility to rent
> > just one flor. Please
> > contact Rahima (bosnian only) 532 042
> >
>
---------------------------------------------------------------------------
> > ----
> > Apartment for rent (Posted by Branka Pesic on 19
> Mar
> > 2003)
> > Apartment in the centre of the city (Cemalusa 4),
> > near the Bosnian Cultural
> > Center, beautiful large living room, kitchen,
> > bedroom and study room unique
> > antique furniture, wooden floor, rent 800KM +
>
=== message truncated ===
```

---

Do you Yahoo!?
Yahoo! Platinum - Watch CBS' NCAA March Madness, live on your desktop!
http://platinum.yahoo.com

## RT HON LORD ASHDOWN OF NORTON-SUB-HAMDON GCMG KBE PC



*To whom it may concern*

Anthony Sarkis served as General Counsel of the Office of the High Representative for Bosnia and Herzegovina ("OHR") during most of my mandate as High Representative. I found him to be reliable, talented and an excellent advisor.

Anthony made a most important contribution to OHR's internal governance rationalization, legal sustainability and transition capacity-building. Within weeks of his arrival, he initiated a process which culminated in OHR's legal interests being considerably advanced. He also helped me to ensure that important legal aspects of my personal mandate were put in order and made consistent with best practice.

Anthony's expertise and experience in best practice implementation were not limited to the legal sphere. On several occasions, he displayed considerable foresight by proactively identifying and helping to resolve sensitive political, public relations and security issues.

During my concurrent mandate as European Union Special Representative in Bosnia and Herzegovina ("EUSR"), I approved Anthony's *de facto* appointment as the general counsel of my EU diplomatic/advisory mission. He immediately proceeded to set in place a coherent and comprehensive legal and diplomatic framework, enabling the bourgeoning office of the EUSR to grow and to carry out its functions in an atmosphere of certainty, predictability and legal security. The process leading up to this entailed negotiations with institutions of the EU and domestic authorities in Bosnia and Herzegovina. Anthony carried out these negotiations in an exemplary manner. The resulting organizational template Anthony developed is now being applied by the EU to its other EUSR missions worldwide.

The sensitive nature of Anthony's work prevents me from delving into further details.

I have no hesitation in recommending Anthony without qualification.

Paddy Ashdown

EXHIBIT

B

**Dr. Christian Schwarz-Schilling**
*The High Representative for Bosnia and Herzegovina*

To Whom It May Concern

25 April 2007

Anthony Sarkis has served as General Counsel of the Office of High Representative for Bosnia and Herzegovina (OHR) during my tenure and that of my predecessor, Lord Ashdown.  He has made significant contributions to OHR.  Since his arrival at OHR, Anthony has helped to place the organization on a sound legal footing and has given legal advice directly to the High Representative. Moreover, he has helped me and my predecessor to consolidate critical personal legal aspects of our respective mandates.  It is without hesitation that I recommend him unreservedly.  I wish him all the best for his personal and professional future.

Dr. CHRISTIAN SCHWARZ-SCHILLING

OHR    Office of the High Representative for Bosnia and Herzegovina
E. Bhanu 1  71000 Sarajevo • 387 33 283 500 - fax: 387 33 283 501
Brussels: 155 Rue Froissart, 1048 Brussel – 32 2 285 7649





**OHR**
Office of the
High Representative

# Employment Contract 2007

| | | |
|---|---|---|
| **Between:** | Name | **Anthony Sarkis** |
| | Nationality | **USA** |
| | Date of birth | |

hereafter called "the Contractor"

**And:** Office of the High Representative
Emerika Bluma 1, 71000 Sarajevo, BiH
here represented by Mrs. Sunita Samarah (Head of Personnel), hereafter
called "the OHR"

The terms of this contract are as follows:

## 1. Basic Terms of Contract

| | |
|---|---|
| OHR Employment Category: | International Contractor |
| Title: | General Counsel to OHR |
| Duty station: | Sarajevo |
| Department: | Legal department |
| Effective date of appointment: | 1 January 2007 |
| Grade/Step: | 10/3 |
| Gross monthly salary: | 6,190 EUR |

Personnel Policies 2003 of the Office of the High Representative, as well as the
Standards of Ethical Conduct, form an integral part of this contract. By signing this
contract, the contractor undertakes that they acknowledge and accept the contents
thereof.

Page 1 of 2



**EXHIBIT**

D

OHR will pay or allow the benefits listed below in addition to he gross monthly salary.

- A monthly Housing Allowance equal to 20% of the gross salary
- A monthly Hardship Allowance equal to 5% of the gross salary
- Annual Leave
- Travel Allowance of 165 EUR per month
- Insurance Coverage
- End of contract allowance of 1/12th of a month's salary for each month (pro-rata for a part of a month) of paid work payable at the end of the contract period.

## 2. Duration

The appointment is for a fixed period from 1 January 2007 until 31 October 2007.

## 3. Contractual Obligations

3.1. The Contractor must sign and return prior to effect being given to his contract the following:

- One copy of the signed employment contract
- One signed copy of the OHR Standards of Ethical Conduct
- One signed disclosure of interest form

3.2. By signing this contract, the Contractor accepts the appointment and conditions set out in this contract and the terms and conditions as set out in the OHR Personnel Policies 2003 and the Contractor hereby confirms acceptance and compliance with the terms and principles set out in the OHR Standards of Ethical Conduct.

3.3 The Contractor solemnly undertakes to serve the Office of the High Representative and to carry out the functions and tasks assigned to them to the best of their abilities. The Contractor also solemnly undertakes to exercise their duties loyally and with discretion.

3.4 The Contractor agrees not to disclose, after they have left the OHR, any information they acquire that is confidential to the OHR. The Contractor undertakes to report to the Head of Personnel any attempt by anyone outside OHR to obtain from them information confidential to the OHR.

3.5 Where necessary, the OHR may assign the contractor to additional or new duties and/or a new duty station, temporarily or for the duration of the contract as required by the OHR.

## 4. Working Hours

The Contractor is obliged to work the normal working days of the OHR which are Monday through Friday at the times specified by their Supervisor or Head of Department/Head of Office. The Contractor is expected to work the number of hours necessary to complete his/her duties. No overtime is paid.

**5. Termination of the appointment**

Notwithstanding the contents of article 2 hereof, either party may terminate the appointment at any time with two months notice signed by the party and in writing. Such notice does not have to end on the last day of a calendar month.

**6. Contract Procedures**

This contract will enter into force after signature by both parties and after compliance with condition 3.1 hereof. This contract is made in two originals in the English language, which will each be signed by both parties. Both contracting parties shall keep one copy of this contract.

| | |
|---|---|
| *January*<br>03/11/06<br>**for the OHR (signature and date)** | *2⁴.11.06*<br>**for the Contractor (signature and date)** |



**OHR**
Office of the
High Representative

# PERSONNEL POLICIES AND PROCEDURES,

### Approved by the Peace Implementation Council Steering Board on 11 June 2003

**PAGE**

**TABLE OF CONTENTS** .................................................................................................... 2

1. INTRODUCTION ...................................................................................................... 2
2. OHR EMPLOYMENT CATEGORIES .......................................................................... 2
3. CONDITIONS OF EMPLOYMENT ............................................................................. 2
4. SOLE EMPLOYMENT ............................................................................................... 2
5. RECRUITMENT ....................................................................................................... 3
6. HIRING OF CONTRACTOR FAMILY MEMBERS ........................................................ 3
7. ANTI DISCRIMINATION AND HARASSMENT ........................................................... 3
8. ADVERTISEMENT OF VACANT POSITION ............................................................... 4
9. HIRING .................................................................................................................... 4
10. INTERVIEWS .......................................................................................................... 5
11. CURRENT OHR CONTRACTOR............................................................................... 5
12. AFTER CONTRACTING ........................................................................................... 6
13. PROMOTIONS ........................................................................................................ 6
14. SALARY PACKAGE FOR CONTACTORS .................................................................. 6
15. HOUSING AND HARDSHIP ALLOWANCES PAID TO INTERNATIONAL CONTRACTORS AND INTERNATIONAL CONTRACTORS /FUNDED ........................................................................................... 7
16. TRAVEL TO AND FROM BOSNIA AND HERZEGOVINA .............................................. 7
17. BANK PAYMENTS ................................................................................................... 7
18. RECOGNITION OF OHR CONTRACTOR .................................................................. 8
19. TRAVEL ALLOWANCE ............................................................................................ 8
20. WORKING CONDITIONS ......................................................................................... 8
21. HOURLY CONTRACTS............................................................................................ 8
22. OVERTIME .............................................................................................................. 9
23. LEAVE .................................................................................................................... 9
24. ANNUAL LEAVE ..................................................................................................... 10
25. SPECIAL LEAVE..................................................................................................... 10
26. OFFICIAL HOLIDAYS .............................................................................................. 10
27. RELIGIOUS / TRADITIONAL DAYS.......................................................................... 10
28. SICK LEAVE ........................................................................................................... 11
29. MATERNITY LEAVE ............................................................................................... 11
30. PATERNITY LEAVE ................................................................................................ 11
31. LEAVE WITHOUT PAY ............................................................................................ 11
32. ANNUAL LEAVE PROCEDURES ............................................................................. 12
33. INSURANCE COVERAGE......................................................................................... 12
34. INSURANCE PROCEDURES.................................................................................... 12
35. EVALUATIONS OF CONTRACTORS ........................................................................ 13
36. TERMINATION OF CONTRACT .............................................................................. 13
37. TERMINATION BY EITHER PARTY WITH NOTICE PERIOD ...................................... 13
38. EXPIRATION OF THE CONTRACT ........................................................................... 13
39. DISCIPLINARY PROCEDURES ................................................................................ 15
40. GRIEVANCES AND CONFLICT RESOLUTION .......................................................... 15
41. WORK ENVIRONMENT AND PROFESSIONAL CONDUCT ........................................ 15
42. DEALING WITH HARASSMENT AND DISCRIMINATION ........................................... 16
43. CHANGES TO OHR PERSONNEL POLICIES ............................................................ 17
44. INTERPRETATION OF PERSONNEL POLICIES......................................................... 17

**EXHIBIT**

E

## 1. INTRODUCTION

(a) This edition of OHR Personnel Policies replaces all previous Personnel Policies. It establishes and explains the general conditions of employment of all Contractors at the OHR.

(b) The OHR Personnel Policies are prepared in conjunction with the OHR Financial Rules and Procedures. In the event of conflict, the OHR Financial Regulations and Rules govern.

(c) As changes to Personnel Policies are approved, staff will be informed about substantive changes and the changes will be incorporated into the Personnel Policies document on OHR Intranet.

## 2. OHR EMPLOYMENT CATEGORIES

(a) **Secondees:** Persons seconded by Governments/International Organizations.

(b) **International Contractors/Funded:** International Contractors specifically funded by a Government/International Organization.

(c) **International Contractors:** International Contractors recruited worldwide in accordance with OHR Personnel Policies. Preference shall be given for the hiring of International Contractors to citizens of Peace Implementation Council countries (PIC).

(d) **National Contractors:** Contractors who are citizens of Bosnia and Herzegovina. New Contractors holding multiple citizenships including BIH citizenship will be considered as National Contractors.

(e) **National Contractors/Funded:** Contractors who are specifically funded by Governments/ International Organizations and who are citizens of Bosnia and Herzegovina.

(f) **Interns:** International students with an educational background relevant to the mandate of the OHR.

(g) **Junior Professionals Program:** A limited number of Junior Professionals who have completed their university studies will work in the field of their educational expertise. Available only to citizens of Bosnia and Herzegovina.

## 3. CONDITIONS OF EMPLOYMENT

Employment contracts shall not be binding until signed by both parties

## 4. SOLE EMPLOYMENT

Contractors must obtain approval in writing from the Head of Personnel for any other employment in which they are engaged. OHR office facilities assigned to a contractor shall not be used for personal benefit.

## 5. RECRUITMENT

(a) All budgeted vacant posts will be filled by

    Internal recruitment
    or
    Internal promotion
    or
    External Recruitment

(b) Personnel will administer the recruitment process for contracting of all OHR Contractors.

(c) The Head of the Department or Head of Regional Office having a vacancy in his/her Department/office will complete a Personnel Request Form (PRF). Personnel and Budget Section will ensure that the post is correctly graded and that it is budgeted.

(d) Terms of Reference (ToR) for the position will be attached to the PRF. The ToR will state the primary duties and obligations the Contractor is required to perform.

(e) The ToR will specify professional qualifications and experience the Contractor is required to have. The Terms of Reference will be prepared by the Head of Department and submitted to Personnel for review and approval.

## 6. HIRING OF CONTRACTOR FAMILY MEMBERS

Members of a Contractor's family; father, mother, wife, husband, brother, sister, uncle, aunt, first cousin shall not be hired to work under the supervision of a family member.

## 7. ANTI DISCRIMINATION AND HARASSMENT

The policies set forth in the OHR Standards of Ethical Conduct shall apply.

## 8. ADVERTISEMENT OF VACANT POSITION

(a) Job Vacancies will normally be advertised internally for existing OHR staff in the first instance.

(b) All vacancy advertisements will state whether or not applications can be considered from applicants who are not citizens of BiH.

(c) All vacancy advertisements will state that applications will not be acknowledged unless the applicant is short-listed for interview.

(d) Personnel will create a Job Vacancy Notice for each vacant position. The Terms of Reference for the position will be the basis for the Vacancy Announcement.

(e) The Job Vacancy announcement will clearly state the primary duties to be performed by the Contractor in addition to the experience and professional qualifications required for the position.

(f) Personnel exclusively will advertise all OHR vacant positions. Taking into consideration that English is the working language of the OHR; all candidates shall be required to have competency in the English language to execute the obligations of the advertised position vacancy.

(g) Personnel will decide the most appropriate, transparent and cost efficient method for advertising the job vacancy. These will be considered based on budgetary constraints and/or recruitment strategy. All vacancies will be advertised as follows:

- Internal advertisement on Contractor bulletin/external boards and OHR Intranet.
- External advertisement on OHR website.
- Vacancy announcements when necessary shall be advertised in newspapers where OHR has Regional/Field offices.
- Any and all other media as deemed appropriate.

(h) All job vacancies will be advertised for a minimum period of one week. Potential candidates will be asked to provide Personnel with their curriculum vitae and photocopies of educational/professional certificates/diplomas.

3

(i) The Head of Perso...  , after consultation with the Resources C  ttee, and the relevant Head of Department can elect not to advertise a position if time restrictions prohibit or other extenuating circumstances exist. This will be reflected as part of the recruitment/selection process permanent record.

(j) Personnel shall process all job applications. All job vacancy applications shall be registered and kept on file in Personnel for a period of one year from the closing date of the vacancy announcement.

(k) Applicants who contact OHR without reference to a specific vacancy advertisement will be advised to re-apply if they see a suitable vacancy advertised.

## 9. HIRING

(a) After the closing date mentioned in each job vacancy announcement all applications received for the position shall be reviewed by Personnel.   Candidates who fall well short of the experience and/or qualifications required will be separated out.

(b) The recruiting Department will be given all the CVs received and will select a short list for interview.  If the short-list contains a candidate from the "lacking in experience and qualifications" category, then reasons must be provided in writing to Personnel. These reasons will be held in the permanent interview record.

(c) In case of equally suitable candidates, priority consideration will be given to current OHR Contractors.

(d) After selection, Personnel will issue a letter of offer for the position. Acceptance of the conditions stipulated in the letter of offer will be a prerequisite for final contracting of a staff member.

## 10. INTERVIEWS

(a) Those applicants who are deemed to be suitable for interview will be contacted by Personnel and invited to attend an interview. Where possible, applicants are to be given at least 48 hours prior notice of the time of the interview. For applicants residing outside BiH, at least 72 hours notice will be given. OHR may pay the cost of transport and accommodation for interviews.

(b) An interview panel shall consist of at least three OHR staff members. A panel will always include a member of the Department carrying the vacancy, a member from another Department and a member from Personnel or their designates.  Department Heads or those holding higher office, may request additional interviews of potential candidates. Personnel will produce a record of the interviews and, in consultation with the other panel members, compose the final evaluation report describing the overall profile of the top three candidates.

(c) The evaluations shall include the ranking of the top three candidates by each panel member and an agreement on the best candidate to fill the vacancy. All panel members will sign the evaluation report. All interview panel members will be briefed on proper interview techniques. There is no set format for interviews but good interviewing skills should be a condition for panel membership. Interviewers must ask relevant questions and make the appropriate assessments commensurate with the position to be filled.

(d) Personnel shall check all references given by the provisionally selected candidate after the interview. Should Personnel or interview panel members receive unfavorable information about a candidate from a reference, this information will be immediately communicated to the interview panel and documented. Consideration shall be given to any and all references and the information obtained will be a factor in the confirmation of a candidate's selection.

(e) The Head of Department/Regional Office in conjunction with the interview panel members will recommend the preferred candidate to the Head of Personnel.

4

(f) The Head of Personnel shall approve the selected candidate unless the candidate recommended for selection does not have the determined profile for the job. In such case the Head of Personnel will consult with the Head of Department/Regional Office and agree on the required action.

(g) Personnel shall inform the successful candidate as soon as possible after the decision has been made.

(h) In case of international candidates of equal qualifications, factors such as the requirement that the OHR staff be broadly representative of the Peace Implementation Council membership countries should be taken into consideration.

(i) The name, date of birth, application form/CV, and copy of identity papers or passport together with all documentation required for the payment of social contributions of the successful candidate is to be passed to Personnel as soon as possible so as to facilitate the contracting process.

## 11. CURRENT OHR CONTRACTOR

(a) If the successful candidate is already an OHR Contractor, his/her employment in the new position shall start no earlier than two weeks after the candidate has been selected unless the current Department Head agrees to his/her early release.

(b) Personnel will prepare a letter of change of employment details for the Contractor. All information for the letter outlining change of contractual details is obtained from the PRF, ToR and other information provided to Personnel.

(c) The duty station of any of the persons mentioned in the Employment Categories may be changed when the needs of the OHR dictate.

## 12. AFTER CONTRACTING

(a) National Contractors will receive unlimited-time contracts unless they are employed specifically for short term projects

(b) International Contractors will receive contracts terminating at the end of the current calendar year.

(c) New Contractors will receive the following before commencing employment with the OHR:

- two copies of the employment contract.
- a letter of welcome signed by the High Representative.
- a copy of the OHR Contractor Insurance and Medical Policy
- a blank Notification of Beneficiaries Form
- a blank Personal Details Form
- a copy of Personnel Policies
- two copies of the OHR Standards of Ethical Conduct
- bank detail form for payment of salaries
- two copies of Disclosure of Interest form
- welcome pack (International Contractors only)

(d) The Contractor is to return the following items to Personnel:

- the signed Form of Acceptance / Employment Contract
- the completed Notification of Beneficiaries Form
- the completed Personal Details Form
- one copy of the signed OHR Standards of Ethical Conduct bank detail form for payment of salaries
- One copy of the signed Disclosure of Interest form

(e) OHR reserves the right to impose a probationary period for any contractor assuming new responsibilities.

5

(f) No person shall start working for the OHR without having signed his/ her contract.

## 13. PROMOTIONS

(a) Where a vacancy exists in a budgeted post, suitably qualified and experienced OHR contractors from within the same unit may be considered for promotion without going through the vacancy advertising/interviewing process.

(b) The conditions for considering a promotion are

- The promotion must occur within a unit
- The promotion must be into an existing budgeted graded post.

(c) Requests for considering Promotion will be assessed by the Resources Committee - by reviewing the following documents as supplied by the requesting Head of Department/Head of Region:

- Written justification including reasons why the chosen contractor has been selected and why other candidates have not been selected,
- ToRs for the candidate's current post and the promoted post,
- Candidate's CV,
- Candidate's Annual Appraisal records and
- Candidate's disciplinary record.

## 14. SALARY PACKAGE FOR CONTACTORS

(a) Details of salary packages for OHR Contractors are contained in employment contracts.

(b) Salaries will be paid in Konvertible Marks or EUROS. The OHR is not responsible for a decrease in income or spending power due to changes in monetary exchange rates.

(c) Basic monthly salaries for new contractors will be determined by the grade of the post concerned.

(d) Contractors will normally be appointed to step 1 in the grade of their new post. Thereafter National Contractors will receive a step salary increase at the start of each calendar year.

(e) Contractors will be paid monthly, in arrears. Where the remuneration is not due in respect of a complete month, the Contractor shall receive a proportion of his/her monthly salary for each working day in respect of which remuneration is due.

(f) OHR will pay agreed social contributions for National Contractors and National Contractors/Funded as applicable. A Contractor may make voluntary social and/or health contributions for themselves or their family members with the appropriate local authorities.

(g) It is the responsibility of International Contractors and International Contractors/Funded to make their own tax and social security payments in their country of normal residence. No payments are made by the OHR to pension funds for International Contractors and International Contractors/Funded.

(h) All or part salary may be paid into a bank at the duty station of an International Contractor or International Contractor/Funded.

## 15. HOUSING AND HARDSHIP ALLOWANCES PAID TO INTERNATIONAL CONTRACTORS AND INTERNATIONAL CONTRACTORS /FUNDED

(a) A housing allowance of 20% of the Base Salary is paid towards the costs of housing at the duty station.

6

(b) A hardship allow      of 5% of the Base Salary is paid to cc      sate for the limited possibilities of conducting social activities and for living in a foreign country with heightened levels of security.

(c) These allowances will be paid in Konvertible Marks in advance each month at the duty station or may be paid into the bank account designated by the Contractor.

## 16. TRAVEL TO AND FROM BOSNIA AND HERZEGOVINA

(a) Unless otherwise specified the OHR will pay the initial cost of travel to the duty station with the equivalent maximum value of a one way economy class flight ticket from the International Contractor or International Contractor/Funded country of normal residence as indicated on the signed contract.

(b) Unless otherwise specified, the OHR will pay the return journey at the end of the tenure with the OHR of the International Contractor or International Contractor/Funded from the duty station to the Contractors country of normal residence, as indicated on the signed contract, with the equivalent maximum value of a one way economy class ticket.

(c) In addition and unless otherwise specified the OHR will reimburse, if any, the extra cost of luggage to a maximum weight of 50kg. This may be sent as excess baggage or consigned through a cargo company. OHR will only pay the equivalent of the cost as if it were sent as excess baggage. The Contractor will pay this cost and submit receipts furnished to the OHR for reimbursement.

(d) OHR will reimburse the cost of up to five nights approved hotel accommodation for new contractors when they arrive in BiH

(e) OHR staff who drive to or from their address of normal residence, rather that flying, may claim a reimbursement of 0.34 KM/km. The total reimbursement for such a journey shall not exceed the cost of a one way economy class flight ticket.

## 17. BANK PAYMENTS

(a) All salary payments shall be made directly into the Contractor's bank account. International Contractors and International Contractors/Funded must hold their account in their country of normal residence, in a country in which the OHR has an office or in a country of which they hold a passport.

Otherwise, they must produce a tax-clearance certificate from the tax authorities of their country of normal residence. Such contractors are obliged to regularize their own domestic tax affairs in their respective countries.

(b) All bank accounts must be such as to allow direct bank electronic transfers from OHR banks. The OHR is not responsible for delays or any payment of damages as a result of Contractors furnishing incorrect or incomplete bank details or of the errors made by corresponding banks.

(c) OHR is entitled to deduct from any Contractors salary any payment owing to the OHR. This shall include any telephone bills for which the Contractor has not submitted a statement for private calls. The Contractor will have 30 days to settle any and all outstanding telephone bills.

(d) The OHR will instruct its bank to transfer salary payments before the end of the month to which the salary relates. The OHR shall not pay currency exchange differences or currency related bank charges charged to a receiving account.

## 18. RECOGNITION OF OHR CONTRACTOR

(a) Salary levels for National Contractors are entirely dependent on the grade of the post and the length of service of the Contractor.

7

(b) Salary levels for ... ational Contractors are dependent on the g    of the post, and step changes within the grade may only be made when they are sufficiently justified and approved by the Resources Committee.

(c) Requests to review the grade of a post may be made by Heads of Departments or Heads of Regions only if the work content of the post has changed significantly and only after a new TOR has been approved. Reviews will be undertaken by the Grading Review Panel who will make recommendations to the Director of Resources for final approval.

(d) If a change in salary levels or grades is approved, the Contractor will receive a letter of notification from Personnel.

## 19. TRAVEL ALLOWANCE

If specifically mentioned in the contract, the OHR may pay a Travel Allowance where the employment contract stipulates. The travel allowance will be paid in arrears with the Contractors salary payment. The OHR will pay a monthly Travel Allowance of Euros 165 to International Contractors and International Contractors/ Funded.

## 20. WORKING CONDITIONS

(a) Contractors will be required to work, as a minimum, the hours and days of the week specified in their contract.

(b) Working days and working hours for Contractors vary depending on the employment category of the Contractor.

## 21. HOURLY CONTRACTS

(a) Contractors with hourly contracts will work the hours requested by the Head of Department and should only report to work when requested to do so.

(b) A Contractor with an hourly contract shall submit a time sheet each month to the Department Head for approval. This time sheet shall then be forwarded to Personnel for salary payment. If the Contractor leaves the area of the Duty Station for extended periods, they should notify the Head of Division of the appropriate Regional Office who will advise Personnel.

(c) Where possible, Contractors with hourly contracts are to be given at least 24 hours notice of the requirement for them to report to work.

## 22. OVERTIME

(a) Overtime will not be paid to Contractors in grade 8 and above, Interns or Junior Professionals

(b) Contractors in grades 1 to 7 should be given time off in lieu (TOIL) wherever possible instead of authorizing overtime. Division Heads will administer TOIL. Large amounts of TOIL should not be allowed to accumulate. Unused TOIL will lapse at the end of each calendar year.

(c) Paid overtime shall only be granted in exceptional circumstances and shall be approved in writing by the Head of Personnel in advance. Additionally, the Contractor may not work overtime without the prior approval of the Head of Department/Regional Office.

(d) The Contractors shall complete an overtime request form and forward it to their Head of Department/Regional Office for approval. Approved paid overtime shall be paid at the same rate as normal work hours (prorated daily rate of their monthly contract).

(e) It is the responsibility         .eads of Departments/Regional Offices to en         .hat Contractors are not required to work additional hours that result in overtime being accrued.

(f) Overtime shall not be paid to Contractors on professional pay grades, Interns or Junior Professionals. Contractor on non-professional pay grades should be given (TOIL) Time Off In Lieu whenever possible instead of authorizing overtime. The Division Head will manage TOIL. A large amount of TOIL should not be allowed to accrue. Any unused TOIL will lapse at the end of the calendar year

## 23. LEAVE

(a) Contractors are encouraged to take all accrued leave at intervals throughout the calendar year. Leave is a contractual right that ensures that Contractors do not work too long without respite.

(b) Heads of Department / Regional Offices shall ensure the enforcement of the leave policy. Any deviations from this policy shall require the approval of the Head of Personnel.

(c) Leave is categorized as follows:

- Annual Leave
- Special Leave
- Official Holidays
- Religious / Traditional Days
- Sick Leave
- Maternity leave
- Paternity Leave
- Leave Without Pay

(d) Personnel shall maintain a record of all leave types used by each Contractor.

## 24. ANNUAL LEAVE

(a) All National Contractors are entitled to 30 days paid Annual Leave per year (calculation pro rata), accrued at a rate of 2.5 days per month, unless specifically stipulated differently in the individual contract.

(b) International Contractors and International Contractors / Funded are entitled to 36 days paid Annual Leave per year (calculation pro rata), accrued at a rate of 3 days per month, unless stipulated otherwise in the individual contract. Only working days are used in the calculation of Annual Leave entitlements.

(c) All Contractors are permitted to take a maximum of 15 consecutive working days leave. The Head of Personnel may use his/her discretion to approve more leave if extenuating circumstances exist. The minimum Annual Leave that can be taken with any single request is 0.5 days.

(d) The entitlement to Annual Leave commences on the first day of a month. If the effective date of appointment in the contract is not the first day of a month, the entitlement to Annual Leave commences on the effective date of appointment.

(e) A maximum of 10 Annual Leave days may be carried forward from one year to the next. If more than 10 days are unused, the excess days will be forfeited.

(f) Contractors leaving the OHR are not entitled to payment for unused leave.

(g) If approved, annual leave may be taken in anticipation of the accrual of entitlement.

(h) A Contractor leaving the OHR who has taken more leave than his / her entitlement will have the value of the leave which is taken in excess of his / her entitlement, deducted from his / her final salary payment. Final salary payments are subject to the completion of all out-processing.

(l) To calculate the equivalent value of Annual Leave days, only working days are taken into account. The equation used is:

[Annual Leave days] / [working days in contract period] x [monthly gross salary] X 12

## 25. SPECIAL LEAVE

Special leave entitlement will be used only in exceptional situations (i.e. death of a close relative, birth of a child for fathers, sickness of a child, etc.). The Head of Personnel may approve a maximum of 5 days of paid Special Leave per annum. Claims for special leave must be made on a Leave Application Form and must, if so requested by the Head of Personnel, be supported by relevant certification.

## 26. OFFICIAL HOLIDAYS

(a) The OHR will, apart from the exceptions set out in c) below, close for Official Holidays. If any of these days fall on a Saturday or Sunday, the following working day will be the Official Holiday:

- 1 January
- 1 May
- 25 November

(b) Official Holidays are paid days. If a Contractor is required to work on any of these days on the instruction of the Head of the Department/Regional Office he/she will be granted a compensatory paid leave day. This compensatory leave day is be used at his/her discretion with the approval of his/her Head of Department/Regional Office within one month of the Official Holiday.

(c) Basic administrative functions may require to be staffed on Official Holidays include Security, Reception, Transport, Switchboard, Interpreters, and Information Technology.

## 27. RELIGIOUS / TRADITIONAL DAYS

All OHR Contractors shall be granted two additional paid leave days in order to accommodate their religious and/or traditional needs.

## 28. SICK LEAVE

(a) Uncertified

Contractors are entitled to seven paid Sick Leave days per annum to cover for the minor health problems such as cold, flu, migraine, etc. A maximum of two consecutive uncertificated sick leave days can be claimed per occasion.

(b) Certified

Certified Sick Leave can extend up to one (1) year based on certification by medical practitioners. In such cases the following sick leave scheme shall be applied per occasion

i.      up to 3 months sick leave – 100% salary
ii.     subsequent 3 months – 50% salary
iii.    subsequent 3 months – unpaid
iv.     subsequent 3 months – unpaid (this period only at the discretion of the Resources Committee).

This entitlement will be treated separately from the seven days entitlement allocated for minor health problems.

10

The Contractor is requir... .o inform his/her immediate supervisor of th... rt of a certified sick leave and the estimated duration of absence. The information must allow the OHR to verify where the Contractor is located. The Contractor must produce a certificate on the day of his/her return to work.

OHR reserves the right to verify sick-leave claims at any time by, for example, requesting contractors to appear before a Medical Commission.

The Department or regional office will immediately advise Personnel of any sick leave. Personnel shall maintain a record of sick leave days.

Copy of the Sick Leave application for Contractors shall be maintained as a permanent record in the Contractors file.

### 29. MATERNITY LEAVE

(a) Contractors are entitled to paid Maternity Leave of up to 22 weeks. First 14 weeks will be at full salary while the remaining 8 weeks will be at 50% of salary.

(b) Unused Maternity Leave is not payable.

(c) Annual Leave will be accumulated during maternity leave.

(d) If a Contractor's contract expires during Maternity leave, the Maternity Leave shall only be paid to the end of the existing contract.

### 30. PATERNITY LEAVE

(a) There is no specific Paternity Leave entitlement because this is covered by Special Leave.

(b) If both parents are OHR contractors, a father will be allowed to use the mother's entitlement (maternity) as paternity in cases where the conditions dictate (i.e. death of the mother, abandonment of the child, serious health problems following the delivery, etc.).

### 31. LEAVE WITHOUT PAY

Leave without Pay may be granted by the Head of Personnel in consultation with the relevant Head of Department/Region. The length of Unpaid Leave is limited to 6 months.

### 32. ANNUAL LEAVE PROCEDURES

(a) All requests for paid annual leave shall be submitted at least 48 hours before the first requested day of leave on the OHR Request Form and submitted to the Head of Department/Region for his / her approval. Leave applications must specify what type of leave the Contractor is requesting.

(b) Once the leave request form is approved as stated above, it will be forwarded to Personnel for recording in the Contractor's file.

(c) If a Contractor is absent from work without the correct authorization, payment of their salary shall cease for the period of the absence and the Contractor may be subject to disciplinary procedures.

(d) If, for any reason, a contractor is found at the end of a calendar year to have used more leave days than his/her entitlement, the excess leave days will automatically be deducted from the following year's entitlement.

(e) Leave may be taken in advance of a contractor's monthly cumulative entitlement if approved by the relevant Head of Department/Region.

11

(f) If a contactor leaves OHR having used more leave than his/her cumulative monthly entitlement, the value of the excess leave days will be deducted from his/her final salary.

## 33. INSURANCE COVERAGE

(a) The OHR provides Contractors with health, hospitalization, accident and life insurance, through a company selected by the OHR.

(b) The guarantees, limits and special conditions are detailed in the insurance policy, a copy of which is given to each Contractor upon registration in this insurance plan. The Contractor is advised to check the language of the insurance policy and obtain additional insurance if required at their own expense.

(c) Insurance coverage will start on the day the Contractor signs their contract and completes the form provided for this purpose.

(d) The OHR offers the ability to extend the insurance coverage at the expense of the Contractor to their immediate family members. The cost of all additional premiums will be responsibility of the Contractor. Premium payments will be deducted from the Contractor's monthly salary.

## 34. INSURANCE PROCEDURES

(a) The Contractor shall be responsible for all dealings with the insurance company in respect of personal claims.

(b) Insurance coverage will end when the Contractor leaves the OHR.  Contractors may, however, choose to continue the insurance cover at their own expense for up to six months after leaving OHR.

(c) Insurance coverage will not be paid during leave without pay.

## 35. EVALUATIONS OF CONTRACTORS

(a) OHR operates a Performance Appraisal System, which is part of an annual evaluation process for all Contractors.

(b) All Contractors will be evaluated at the following times:

- no later than six months after starting employment with the OHR
- no later than December 1 each year.

(c) The Contractor's supervisor shall conduct the evaluation. The supervisor shall advise the Contractor with regard to their performance, and may include the following points if appropriate:

- action the Contractor must take to improve performance
- action that may be taken with regard to the Contractor if they do not improve their performance.

(d) The Contractor shall be given a copy of the completed Performance Evaluation and shall be permitted to make representations in relation there to. The final evaluation shall be forwarded to Personnel.

(e) The Performance Evaluation report will be placed in the Contractor's personnel file. A copy shall be given to the Contractor.

## 36. TERMINATION OF CONTRACT

A contract may be terminated in the following ways:

- OHR terminates the contract in writing with or without a period of notice
- Contractor terminates the contract in writing with a period of notice
- By effluxion of time.

## 37. TERMINATION BY EITHER PARTY WITH NOTICE PERIOD

(a) Either party may terminate the contract with a minimum notice period as set out in their contract. The notice of termination by the Contractor shall be in writing, signed, addressed and delivered to the Head of Department/Regional Office.

(b) The notice of termination will be forwarded to Personnel immediately for processing. The notice of termination to the Contractor by the OHR will be signed by the Head of Personnel and sent or handed to the Contractor. Notice sent in this manner may be posted to the last known address of the Contractor.

(c) No leave days may be taken during a notice period unless agreed with the respective Head of Department.

## 38. EXPIRATION OF THE CONTRACT

(a) With the exception of a few National Contractors recruited to work on specific fixed term projects, National contracts do not have an expiry date.

(b) International contracts are valid for a maximum period of one year and will automatically expire at the end of the contract period. International contracts are not automatically renewed. The OHR will aim to inform the Contractors at least two month in advance in case the OHR intends not to renew a contract after it expires.

## 39. DISCIPLINARY PROCEDURES

(a) The Contractor or Intern ("employee") is required to comply with his/her contractual obligations and with OHR policies, to perform professional duties in accordance with generally-accepted norms and, generally, to demonstrate his/her fitness as an OHR employee and as a member of the OHR community. Failure to do so, whether intentional or through negligence on his/her part, shall make him/her subject to the following disciplinary measures:

- Verbal warning, with a notation of the same made in the employee's disciplinary file
- Written warning given to employee, with a copy placed in the employee's personnel file
- Referral to the Disciplinary Committee

(b) The circumstances under which the preceding measures will be employed are as follows:

- First instance:  verbal warning
- Second instance:  written warning
- Third instance:  Referral to the Disciplinary Committee which may select from among the following three categories of sanctions:  1) minor sanctions; 2) major sanctions; and 3) dismissal.

  OHR reserves the right not to be bound by the sequential order of the above incremental measures and to apply any of them at any time if, in the judgment of the Head of Personnel, the magnitude of the act so warrants.  Additionally, if an employee demonstrates a repeat pattern of violating different contractual obligations and/or policies but on no more than one occasion per obligation or policy, his/her Head of Department and/or Head of Personnel may refer such conduct directly to the Disciplinary Committee, the sequential order above notwithstanding.  The Disciplinary Committee may select from among the following categories of sanctions.

13

- **Minor Sanctions:** Disciplinary action involving sanctions less severe than Dismissal or suspension without pay for one month or more may be imposed. Such minor sanctions may include, without limitation, an oral warning, a letter of reprimand, or a suspension with pay or a suspension without pay for less than one month. Such actions are within the authority of the Disciplinary Committee. Imposition of a minor disciplinary sanction will occur only for adequate cause, which may include any conduct or performance problem adversely affecting the fitness of the employee to function in the role of employee of OHR or colleague in the OHR community, such as professional or personal misconduct; failure, without adequate justification and whether due to incompetence or refusal, to perform professional duties in accordance with generally accepted norms; violations of law or of OHR policy.

- **Major Sanction Other Than Dismissal (Suspension):** If the Disciplinary Committee believes that the conduct of an employee does not justify dismissal but is sufficiently grave to merit serious rebuke, it may decide on suspension from employment without pay for a period of one month or more.

- **Dismissal:** Adequate cause for dismissal of an employee must relate, directly and substantially, to the fitness of the employee to function in the role of an OHR employee and colleague in the OHR community. Adequate cause for dismissal includes, without limitation, serious professional or personal misconduct; serious failure, without adequate justification and whether due to incompetence or refusal, to perform professional duties in accordance with generally accepted norms; conviction of a crime; serious violations of other law or of OHR policy.

- **Interim Suspension:** An employee may be suspended pending the final outcome of the dismissal proceedings if, and only if, such action is deemed necessary to protect the employee, other employees, or the institutional property, processes or integrity of OHR from immediate harm. A decision regarding such interim suspension is to be made by the Disciplinary Committee. Ordinarily, salary will continue during such an interim suspension.

(c) The Disciplinary Committee shall be composed of the Head of Personnel, the Legal Counsel and a Head of Department, the latter to be selected by the Head of Personnel and Director of the Resources Department at the beginning of each calendar year to serve for a term of one year ("Rotational Member"). For the calendar year 2003, the Rotational Member may be selected after the beginning of the year. The Disciplinary Committee will initiate a three-stage process, as described below, which might result in dismissal or other action against the employee:

- Preliminary procedure: a statement of charges, relating to the basis for the sanction sought, shall issue at this stage. The Disciplinary Committee shall appoint a preliminary action officer ("PAO") who will investigate the charges and: 1) report back to the Committee with findings and recommendation; or 2) attempt to facilitate resolution of the charges through consultation with the principal parties.

- Pre-hearing procedure: once the matter has been investigated and referred back to the Disciplinary Committee, the Committee may decide to proceed with a hearing. At this stage, the employee will be asked to respond to the charges.

- Hearing: the employee may select an advisor to represent them at this stage. The burden of proof shall be on the party bringing the charges against the employee. The standard of proof shall be "clear and convincing proof", meaning that the evidence has to be of sufficient quantity and quality as would show that the truth of the charges is highly probable. The Hearing Panel (the Disciplinary Committee) shall submit its findings and recommendations to the Director of the Resources Department for review and approval. The Director of the Resources Department shall then forward the same to the PDHR for final approval. This decision shall be final.

(d) OHR incorporates by reference herein the OHR Disciplinary Procedures which may be found on the OHR website. Employees are urged to review these procedures in conjunction with these policies. The Procedures elaborate further on the modalities which will govern the implementation of these policies.

14

## 40. GRIEVANCES AND CONFLICT RESOLUTION

A Contractor or Intern may seek redress in respect of a decision affecting them with regard to any of their contractual entitlement/employment issue.

(a) They shall submit in writing to the Head of Personnel the facts and circumstances of their grievance. The Director of Personnel will attempt to mediate between the Contractor and the other party(ies) involved in the grievance or conflict. The Head of Personnel shall obtain the advice of the OHR Legal Department when necessary.

(b) The Head of Personnel may alternatively appoint at his/her discretion an independent mediator. The mediator shall be a member of the OHR Legal Department.

(c) If a mutual agreement cannot be reached following the conclusion of the processes set forth in Subsections (a) and (b), above, the Head of Personnel shall issue a final ruling after giving each of the involved parties concerned the full opportunity to make representations.

(d) As a second option, the individual may directly contact the Personnel Co-ordinator by meeting, telephone, letter or e-mail to discuss the issue. The Personnel Co-ordinator will treat the communication in the strictest confidence, unless authorised by the individual making the complaint to do otherwise or unless the circumstances are such that the Personnel Co-ordinator has reason to believe that as a result of his/her silence: 1) the individual, another individual or the interests of OHR face imminent harm; and/or 2) a law and/or an OHR policy will be seriously violated. Where the Personnel Co-ordinator is required to disclose the communication, he/she will do so only to the Head of Personnel.

(e) With respect to Subsection (d), above, if the Personnel Co-ordinator determines that the matter may continue to be treated in confidence, he/she will engage the individual bringing the complaint in counselling and dialogue by: 1) helping to identify the individual's interests and objectives; 2) suggesting options; 3) assessing the advantages/disadvantages of each option; and 4) generally, contributing proactively toward the resolution of the matter without involving any third party.

(f) If no resolution is possible through the offices of the Personnel Co-ordinator, the individual bringing the complaint may apply for the remedies contemplated by Subsections (a) and (b), above.

## 41. WORK ENVIRONMENT AND PROFESSIONAL CONDUCT

(a) The OHR does not permit harassment and discrimination in any form. All OHR personnel must be treated with respect and dignity. Hostile behavior or harassment of any type is unacceptable and will not be tolerated. OHR is committed to fair and equitable treatment of all personnel.

(b) The OHR will not tolerate and strictly prohibits harassment and discrimination on the grounds of race, color, gender, religion, origin, ethnic background, sexual orientation or disability. This also applies to the OHR recruitment and hiring policy.

(c) All OHR Contractors and Interns will be required, prior to the signing of their contract, to agree to the terms of the OHR Standards of Ethical Conduct, which they will sign, and a copy placed in their personnel file.

## 42. DEALING WITH HARASSMENT AND DISCRIMINATION

(a) Any individual who considers him/herself a victim of harassment or discrimination is encouraged to first firmly and promptly notify the offender that the behaviour is unacceptable and unwelcome.

(b) If the circumstances warrant, the individual shall bring the matter to the attention of their supervisor. It shall be in the first instance the responsibility of the supervisor to attempt a resolution of the matter.

15

Should they fail in this regard or should they regard such an attempt as futile, the matter may be referred to the Head of Personnel.

(c) The Head of Personnel shall be obliged to investigate the matter immediately and where necessary to inform the OHR Legal Counsel and to attempt to resolve the issue. The OHR will not tolerate retaliation against an individual who makes a complaint with regard to misconduct. All complaints will be treated with confidentiality and discretion and immediately investigated.

(d) When judged by the Head of Personnel to be appropriate, and subject to the agreement of the person making the complaint, the Head of Personnel may appoint an Investigating Officer to investigate the allegation. The Head of Personnel will consult with the Legal Counsel when appropriate.

(e) The Investigating Officer shall ensure that each party to the investigation has full opportunity to present their respective case and such Officer may request witnesses to be called. The Investigating Officer is to present a written report including recommendations to the Head of Personnel as soon as possible.

(f) The Head of Personnel will have the responsibility of deciding appropriate disciplinary measures based on the report and recommendations of the Investigating Officer. The complainant will be informed of any disciplinary action taken.

(g) If the Investigating Officer determines that the complaint has no merit, this finding will be communicated to the Head of Personnel who will then advise the concerned parties.

(h) The OHR will maintain a complete written record of each complaint, investigation and resolution. Written records shall be maintained and kept in a confidential manner in Personnel.

(i) As an alternative to the procedure outlined above, the individual may directly contact the Personnel Co-ordinator by meeting, telephone, letter or e-mail to discuss the issue. The Personnel Co-ordinator will treat the communication in the strictest confidence, unless authorised by the individual making the complaint to do otherwise or unless the circumstances are such that the Personnel Co-ordinator has reason to believe that: 1) the individual, another individual or the interests of OHR face imminent harm; and/or 2) a law and/or an OHR policy will be seriously violated as a result of his/her silence. Where the Personnel Co-ordinator is required to disclose the communication, he/she will do so only to the Director of Personnel.

(j) With respect to Subsection (i), above, if the Personnel Co-ordinator determines that the matter may continue to be treated in confidence, he/she will engage the individual bringing the complaint in counselling and dialogue by: 1) helping to identify the individual's interests and objectives; 2) suggesting options; 3) assessing the advantages/disadvantages of each option; and 4) generally, contributing proactively toward the resolution of the matter without involving any third party.

(k) If no resolution is possible through the offices of the Personnel Co-ordinator, the individual bringing the complaint may apply for the remedies contemplated by Subsections (a) through (i), above.

## 43. CHANGES TO OHR PERSONNEL POLICIES

a) Suggestions for changes to OHR Personnel Policies should be forwarded to the Head of Personnel who in discussions with the Resources Committee will decide appropriate action and recommendations to the Financial Experts. The OHR Personnel Policies shall be distributed with the signed contract.

b) Any changes to the OHR Personnel Policies, are subject to approval by the Peace Implementation Council Steering Board. Approved changes will be immediately communicated to all Contractors.

c) An up to date version of OHR Personnel Policies will always be available on the OHR Intranet.

## 44. INTERPRETATION OF PERSONNEL POLICIES

(a) In the event of an ambiguity arising in these policies, said ambiguity will be resolved pursuant to and in conformity with the interpretation of OHR.

(b) If these policies are discovered to be silent as to a material issue, OHR shall resolve said issue in a manner consistent with the implied general principles underlying these procedures.

17

## OHR DISCIPLINARY PROCEDURES

**A.** OHR has the right to impose disciplinary sanctions upon any Contractor/Intern ("employee"), irrespective of his/her category of employment within OHR. Such sanctions may only be imposed, however, for adequate cause and in accordance with established procedures, all as set forth more fully in these sections. The dismissal of an employee or imposition of a major sanction on an employee is not purely an administrative decision. Rather, as set forth in the procedures below, it is an action that results from due deliberation of colleagues. In the formal proceedings provided below in which dismissal or other major sanction is sought, the burden of establishing adequate cause for applying such sanction will be on the OHR. OHR personnel involved in a disciplinary proceeding are to maintain the confidentiality of information regarding the conduct of the employee who is the subject of the proceeding and related matters, disclosing such information to others only on a need-to-know basis.

Prior to initiating the steps and proceedings discussed below, the Head of Personnel shall confer with the employee in an effort to achieve, by means of thorough discussions, a mutually agreeable resolution. If such a resolution is achieved, the need for further steps/proceedings pursuant to these procedures will be obviated and no documents relating to the discussion will be retained in the employee's personnel records. If the efforts to resolve the issue informally are not successful, a brief, non-prejudicial statement reciting that these informal measures were utilized but were not successful will be placed by the Head of Personnel in the employee's disciplinary file which will be maintained in the office of the Head of Personnel. This file shall not constitute a part of the employee's personnel file.

**B.** The employee is required to comply with his/her contractual obligations and with OHR policies, to perform professional duties in accordance with generally-accepted norms and, generally, to demonstrate his/her fitness as an OHR employee and as a member of the OHR community. Failure to do so, whether intentional or through negligence on his/her part, shall make him/her subject to the following disciplinary measures:

1. Verbal warning issued by his/her Head of Department. A record of such conversation shall be made by the Head of Department and signed by both parties and, after notification of the Head of Personnel, placed in his/her disciplinary file. If the employee declines to sign, the record of the conversation shall, nonetheless, be placed in his/her disciplinary file. The employee may thereupon elect to have placed in said file a brief written explanation as to why he/she did not sign. Should he/she fail to do so, the record of the conversation not signed by him/her shall be presumed to be correct and accurate.

2. Written warning drafted and delivered by his/her Head of Department following approval of the draft by the Head of Personnel. This warning shall be signed by both parties. Thereupon, the original written warning is deposited in the employee's personnel file, and a copy given to the employee by his/her Head of Department. If the employee refuses to sign, the written warning shall, nonetheless, be placed in his/her personnel file. The employee may thereupon elect to have placed in said file a brief



EXHIBIT

F

written explanation as to why he/she did not sign. Should he fail to do so, the Head of Department and/or Head of Personnel will attach to the written warning prior to deposit into the personnel file a brief letter signed by the Head of Personnel, stating the time, place and date of delivery of the written warning to the employee.

3. Dismissal, suspension, reassignment or such other measure as may be deemed appropriate following reference of the matter to the Disciplinary Committee, pursuant to the procedures set forth below.

**C.** The circumstances under which the preceding measures will be employed are as follows:

1. First instance: verbal warning to the employee and annotation in the employee's disciplinary file
2. Second instance: written warning to the employee which is placed in their personnel file
3. Third instance: reference of the matter to the Disciplinary Committee, comprised of the Head of Personnel, the Legal Counsel and a Head of Department, the latter to be selected by the Head of Personnel and Director of the Resources Department at the beginning of each calendar year to serve for a term of one year ("Rotational Member"). For the calendar year 2003, the Rotational Member may be selected after the beginning of the year. The Disciplinary Committee will then initiate a process, as described below, which might result in dismissal or other action against the employee.

However, OHR reserves the right not to be bound by the sequential order of the above incremental measures and to apply any of them at any time if, in the judgment of the Head of Personnel, the magnitude of the act so warrants. Additionally, if an employee demonstrates a repeat pattern of violating different contractual obligations and/or policies but on no more than one occasion per obligation or policy, his/her Head of Department and/or Head of Personnel may refer such conduct directly to the Disciplinary Committee, the sequential order above notwithstanding.

The Disciplinary Committee may select from among the following three categories of sanctions. 1) minor Sanctions; 2) major sanctions other than dismissal; and 3) dismissal. If the Disciplinary Committee determines at the outset that the charges against the employee, even if proved, would merit imposition of no more than minor sanctions, as described in Section D, below, it need not observe the procedures regarding the pre-hearing and hearing processes, set forth in Sections F, G and H, below, before rendering a decision.

**D.** **Minor Sanctions:** Disciplinary action involving sanctions less severe than Dismissal or suspension without pay for one month or more may be imposed. Such minor sanctions may include, without limitation, an oral warning, a letter of reprimand, or a suspension with pay or a suspension without pay for less than one month. Such actions are within the authority of the Disciplinary Committee. Imposition of a minor disciplinary sanction will occur only for adequate cause, which may include any conduct or performance problem adversely affecting the fitness of the employee to function in the role of employee of OHR, or colleague in the OHR

community, such as professional or personal misconduct; failure, without adequate justification and whether due to incompetence or refusal, to perform professional duties in accordance with generally accepted norms; violations of law or of OHR policy. Procedurally, the Disciplinary Committee may, in the exercise of its collective judgment and from its initial review, adopt a more flexible and abbreviated investigative/hearing procedure than the one set forth in Sections F, G and H, below, if it deems that the alleged misconduct, even if proved, will not rise to a level requiring anything more than a minor sanction. The employee will be given notice of the charge and the intent of the Disciplinary Committee to impose a minor sanction and thereafter will be allowed an opportunity to present a defense to the Disciplinary Committee. The Disciplinary Committee will conduct an investigation and review of the relevant circumstances as may, in its judgement, be necessary to determine the validity and assess the seriousness of the charge.

E. Major Sanction Other Than Dismissal (Suspension): If the Disciplinary Committee believes that the conduct of an employee does not justify dismissal under the standards set forth below but is sufficiently grave to warrant suspension from employment without pay for a period of one month or more, formal proceedings may be instituted seeking such action. The procedures set forth in Sections F, G and H will govern such a proceeding. In the statement of charges, the employee should be informed that the proceedings might result in major sanctions, including dismissal.

F. Dismissal: Adequate cause for dismissal of an employee must relate, directly and substantially, to the fitness of the employee to function in the role of an OHR employee and colleague in the OHR community. Adequate cause for dismissal includes, without limitation, serious professional or personal misconduct; serious failure, without adequate justification and whether due to incompetence or refusal, to perform professional duties in accordance with generally accepted norms; conviction of a crime; serious violations of other law or of OHR policy. If the basis for seeking dismissal involves conduct by the employee that is known to the Head of Department or Head of Personnel and that has occurred over a period of time, there should, in accordance with Section B, above, normally be a record of progressive disciplinary measures, evidencing an attempt to allow correction of such conduct prior to the initiation of proceedings under this section.

Preliminary Procedures: In accordance with Section B, above, the decision to refer the matter to the Disciplinary Committee may be made by the employee's Head of Department or Head of Personnel.

Formal dismissal proceedings are initiated by furnishing to the employee a statement of the charges. The charges must relate to one or more of the recognized grounds for dismissal (as set forth in the discussion of "adequate cause", above) and must be framed with reasonable particularity, indicating in at least general terms the factual basis for the charges. The statement must further inform the employee that dismissal is being sought and that the employee is entitled to a hearing on the charges, if he/she desires and if the matter proceeds to that stage. If any interim suspension is being imposed, the employee should be so informed in the statement. The statement is to be prepared by the Head of Personnel, in collaboration with Legal Counsel and Head of Department, and it should be served upon the employee by personal delivery.

The Disciplinary Committee next appoints one or more employees to serve as preliminary action officers (PAOs), providing the PAO a copy of the statement of charges along with the written notice of appointment. No member of the Disciplinary Committee may serve as a PAO. The PAO's shall be selected from among members of the Personnel or Security Departments. The PAO is to carry out the following duties:

    1. Conduct a preliminary investigation of the charges, meeting with the OHR administrator bringing the charges and with the employee to obtain further information. The PAO may interview other individuals and review documents as deemed helpful in gathering the facts relating to the charges. A written report is then made by the PAO to the Disciplinary Committee setting forth a summary of findings concerning the factual basis for the charges and a recommendation for action to be taken. Two actions may be recommended:

    (a) Referral of the case for a formal hearing. Such a recommendation is appropriate where, based on credible information acquired during the preliminary investigation and though there may be some doubt, the PAO believes that there is a reasonable basis for concluding that the charges are true and that they constitute adequate cause to warrant consideration of dismissal or other major or minor sanction.

    (b) Dismissal of the case. Such a recommendation is appropriate in the absence of a "reasonable basis" conclusion, as stated above.

    2. The PAO may attempt to facilitate resolution of the charges through informal consultation with the principal parties, or through other voluntary means, such as counseling conducted by the Head of Personnel. If the principal parties agree to a settlement in this manner, the PAO summarizes the settlement in writing and informs the Disciplinary Committee. The case is then deemed closed. A notation, written and signed by the Head of Personnel, of the proceeding to that point and its informal resolution will be entered into the personnel file of the employee. The notation will be co-signed by the employee. If the employee declines to sign, he may elect to have a brief explanation setting forth the reasons for his/her refusal entered into his personnel file. Should he/she fail to furnish such an explanation, the notation signed only by the Head of Personnel will be deemed the sole authoritative report of the incident.

Upon receipt of the PAO report, the Disciplinary Committee may accept and act on the recommendation (dismissing the charges or referring them for a formal hearing, as recommended), or the Disciplinary Committee may decide not to concur with the recommendation and dismiss the charges or refer them for a hearing as the Disciplinary Committee deems appropriate. If a case is to be referred for formal proceedings, the employee is so informed and asked to respond to the charges. If the case is to be dismissed, the employee is likewise informed.

**G.  Pre-Hearing Procedures:** If the decision is to proceed, the employee would, in a written response to the Disciplinary Committee, answer the charges and indicate whether a hearing is desired. A statement that a hearing is not desired will be regarded as a waiver of any right to a hearing, and the matter will proceed without a hearing. The employee's response should be tendered within five (5) business days from the date of statement of charges' delivery.   The alternative responses of the employee and a summary of subsequent proceedings in each case are as follows:

1.  The employee may admit or acknowledge the truthfulness of the charges and waive a hearing. The Disciplinary Committee will then make the decision regarding dismissal.  The employee and the Head of Department may, prior to such decision, confer with the Disciplinary Committee and/or submit to the Disciplinary Committee materials that they contend should bear upon the Disciplinary Committee's decision.

2.  The employee may deny the charges and/or deny that the charges support a finding of adequate cause but waive a hearing. The decision regarding dismissal will be made by the Disciplinary Committee.

3.  The employee may deny the charges and/or deny that the charges support a finding of adequate cause and request a hearing. A hearing will then be held before the Disciplinary Committee.

4.  A failure to respond will be regarded as an admission or acknowledgement of the charges and a waiver of a hearing. The Disciplinary Committee will then make the decision regarding dismissal.

**H.  Hearing Procedures:** If the employee has requested a hearing in a dismissal proceeding, the following procedures will be followed:

1. The Disciplinary Committee will appoint an individual to act as proponent of the charges.  The proponent is to be responsible for developing and presenting the case against the employee and handling other appropriate duties. The proponent may be any OHR employee, who is not an attorney, including the Head of Department but excluding any member of the Disciplinary Committee.

2.  The employee may select an adviser to assist and represent the employee during the dismissal proceedings. The adviser may be any OHR employee who is not an attorney.

3.  Notice of the date set for the hearing must be given to the parties at least fourteen (14) days in advance of the hearing date.

4.  The hearing will be private.

5.  The burden of proof is on the party bringing the charges against the employee. This burden will be satisfied only by clear and convincing proof of the charges in the record of evidence, considered as a whole, presented to and

received by the Hearing Panel. "Clear and convincing proof" refers to evidence of sufficient quantity and quality as would show that the truth of the charges is highly probable.

6. In the event the employee, after requesting a hearing, does not participate in the hearing process or withdraws in writing the request for a hearing, the Disciplinary Committee will proceed as a committee and not as a hearing panel. It will do so without the employee. The committee will then review the matter and provide recommendations regarding dismissal, if necessary or appropriate under the circumstances. The committee Panel may solicit and receive information from any source to assist it in developing its findings and recommendations.

7. The Hearing Panel will submit its findings of fact and recommendations in a written report to the Director of Resources Department. It may conclude that adequate cause for dismissal does not exist, in which case it may recommend no sanctions or a sanction less than dismissal, or it may conclude that adequate cause for dismissal does exist, in which case it may recommend dismissal. The Director of the Resources Department will review and approve the decision of the Hearing Panel and will forward it to the PDHR for final approval. The PDHR will render a final decision based on the Hearing Panel's report and have it hand-delivered to the employee. The decision will be final and not subject to appeal.

8. Copies of the decision will be sent to the Hearing Panel, the OHR administrators involved in the case, the proponent, and the adviser. These parties will also be provided a copy of the Hearing Panel's report. If the Decision is to dismiss the employee, an effective date (which may be the date of the notice) must be stated.

9. All documents related to a disciplinary proceeding, from the preliminary action phase through a hearing, if any, excepting those which pursuant to other provisions of these procedures have been deposited in the employee's personnel file, shall become part of a disciplinary file which is maintained in the office of the Head of Personnel.

I. Interim Suspension: An employee may be suspended pending the final outcome of the dismissal proceedings if, and only if, such action is deemed necessary to protect the employee, other employees, or the institutional property, processes or integrity of OHR from immediate harm. A decision regarding such interim suspension is to be made by the Disciplinary Committee. Ordinarily, salary will continue during such an interim suspension.

J. Interpretation of These Procedures: In the event of an ambiguity arising in these procedures, said ambiguity will be resolved pursuant to and in conformity with the interpretation of the Disciplinary Committee.

K. Withdrawal of Disciplinary Committee Member: In the event an employee whose case has been referred to the Disciplinary Committee belongs to the legal department or to the department of the Rotational Member, such a committee member shall

withdraw from that particular proceeding.  If the self-withdrawn member is the legal counsel, he/she shall participate in that particular proceeding but only in the capacity of legal adviser to the Disciplinary Committee.